**In the Matter of the Petition for Limitation of Liability of MARINE SULPHUR TRANSPORT CORPORATION, As Owner,**

**and**

**Marine Transport Lines, Inc., As Demise Charterer, of the VESSEL MARINE SULPHUR QUEEN.**

**In the Matter of the Petition for Limitation of Liability of TEXAS GULF SULPHUR COMPANY, As Alleged Owner or Demise Charterer, of the Vessel Marine Sulphur Queen.**

**Nos. 63 Ad. 237, 64 Ad. 769.**

United States District Court,
S. D. New York.
May 12, 1970.

New York City, of counsel, Fields, Rosen, McElligott & Auslander, by Thomas McElligott, Enrico S. San Filippo, New York City, Schneebaum & Blumenfeld, Brooklyn, N. Y., Lebovici & Safir, by Herbert Lebovici, Freedman, Borowsky & Lorry, Philadelphia, Pa., by Ned R. Phillips, New York City, for death claimants.

Cadwalader, Wickersham & Taft, by John A. Sullivan, William S. Busch and Fred R. Profeta, Jr., New York City, for Marine Transport Lines, Inc., Marine Sulphur Transport Corporation and Texas Gulf Sulphur Co.

Cravath, Swaine & Moore, by Harold R. Medina, Jr., George J. Wade, David S. Cupps, and Arnold P. Messing, New York City, for Bethlehem Steel Corporation.

Bigham, Englar, Jones & Houston, by Douglas A. Jacobsen, Joseph J. Magrath, 3d, New York City, for United States Fire Ins. Co. and death claimant Martin.

Schwartz & O'Connell, by Donald E. Klein, Pressman & Scribner, by Frederick C. Stern, Standard, Weisberg, Heckerling & Rosow, by Jack Weinberger, New York City, Larry A. Roach, Lake Charles, La., Cooper, Ostrin, DeVarco & Ackerman, by Samuel Ackerman and Herbert DeVarco, Thomas M. Breen, New York City, Baker, Garber, Chazen & Duffy, by Bernard Chazen and George J. Duffy, Hoboken, N. J., Jack Steinman,

CANNELLA, District Judge.

The petition for exoneration from, or limitation of, liability made pursuant to 46 U.S.C. § 183 et seq. by the Marine Sulphur Transport Corporation as owner, and by Marine Transport Lines, Inc. as demise charterer, of the vessel Marine Sulphur Queen is denied, and the wrongful death claims are allowed. The wrongful death claims are also allowed against the impleaded respondent Bethlehem Steel Corporation as designer and converter of the Marine Sulphur Queen, but these claims as against the impleaded respondent Texas Gulf Sulphur Company are dismissed.

The "contingent" petition for exoneration from, or limitation of, liability made pursuant to 46 U.S.C. § 183 et seq. by the Texas Gulf Sulphur Company as alleged owner or demise charterer of the Marine Sulphur Queen is dismissed, and the claims herein against the Texas Gulf Sulphur Company are dismissed.

The cargo claim of the United States Fire Insurance Company is allowed against the Marine Sulphur Transport Corporation and Marine Transport Lines, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The claims referred to above arise out of the disappearance in the Gulf of Mexico on or about February 4, 1963 of the Marine Sulphur Queen [hereinafter "Queen" or "MSQ"], which had a crew of 39 and a full cargo of molten sulphur. The Marine Board of Investigation convened by the United States Coast Guard to investigate the disappearance conclud-

ed on August 23, 1963 that the *Queen* and her entire crew "must be presumed lost."[1] This court now finds that the MSQ and all her crew members and cargo were in fact lost on or about February 4, 1963.

1. Report of the Marine Board of Investigation to the Commandant of the U. S. Coast Guard, p. 26 (1963). This Report, which was introduced in evidence in its entirety as Claimants' Exhibit 24, was approved by the Commandant on March 17, 1964. The report setting forth this action was put into evidence as Claimants' Exhibit 25.

Pages 20–22 of the Marine Board's Report describe the extensive search that was conducted for the *Queen* as follows: * * * The first information that the MARINE SULPHUR QUEEN was overdue was received by the Commander, Fifth Coast Guard District at 2100 EST, 7 February 1963. This information was immediately sent to the Rescue Coordination Center, U. S. Coast Guard Commander Eastern Area in New York via "hot line." At 2145 EST the Eastern Area Rescue Coordination Center was called by a representative of the Marine Transport Lines, New York Office, reporting that the vessel was overdue, together with a description of the vessel. At 2218 EST, 7 February, the Commander Eastern Area initiated a communication check by an "All Ships Urgent Broadcast" which was repeated three times daily until 16 February 1963. At 2220 EST, 7 February, RCA Radio was contacted as to information on delivery of message to and from the vessel during the period 2–7 February, with the results previously stated.

* * * Based on the above, a surface and air search was planned to commence at 0800 EST, 8 February providing that the communication check failed to locate the vessel. At 0138 EST, Coast Guard units in the 5th, 7th, and 8th Coast Guard Districts were alerted as to the search plan, and at 0800 EST when the communication check was negative, the search was commenced. The search comprised the following:

 8 February—Day search—trackline from Beaumont through Florida Straits to Norfolk, a distance of 1630 miles. Seven aircraft were used in 72 flight hours, searching about 58,000 square miles. This trackline search covered 30 miles on either side of the vessel's estimated track.

 8–9 February—Night search—three aircraft flew 23 flight hours and searched 22,000 square miles.

 9 February—Day search—since vessel was not found along proposed track, a considerably expanded search plan was used. Nineteen aircraft flew 114 flight hours and searched 95,000 square miles.

 9–10 February—Night search—two aircraft flew 12 flight hours and searched 8,300 square miles.

 10 February—Day search—nineteen aircraft flew 136 flight hours and searched 76,700 square miles.

 11 February—Day search—fourteen aircraft flew 86 flight hours and searched 55,000 square miles.

 12 February—Day search—ten aircraft flew 42 flight hours and searched 22,000 square miles.

 13 February—Day search—two aircraft flew 16 flight hours and searched 11,000 square miles.

This concluded the initial search for the MARINE SULPHUR QUEEN. During the period 8–13 February 1963, Coast Guard, Navy, Marine Corps and Air Force aircraft participated in 83 sorties, flying 499.6 hours and searched a total of 348,400 square miles with negative results. Further efforts to locate the MARINE SULPHUR QUEEN during this initial search utilized the Coast Guard Atlantic Merchant Vessel Reporting system which located 42 vessels that could possibly have sighted the MARINE SULPHUR QUEEN on 4 and 5 February. All of these vessels were checked out by Coast Guard personnel with negative results. Several telephone calls were received by Coast Guard units during this initial search phase with information that the ship would be found in Cuba or in Puerto Rico. These leads were checked out by other Federal agencies with negative results.

* * * On 20 February, a U. S. Navy torpedo retriever boat operating about 12 miles southwest of Key West, Florida sighted and picked up a fog horn and life jacket stencilled with the vessel's name. The second phase of the search for the MARINE SULPHUR QUEEN was then instituted, confined primarily to the area just west of Dry Tortugas Island, thence through the Straits of Florida, along the axis of the Gulf Stream, including the Bahamas Islands, and the east coast of Florida to Cape Canaveral. This search with seven ships and 48 aircraft sorties flying 271.4 hours covered an additional 59,868 square miles. The probability of

The court's jurisdiction is based on 46 U.S.C. § 185, on the Jones Act—46 U.S.C. § 688, and on 28 U.S.C. § 1333(1) with regard to the claim arising under the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 *et seq.* Jurisdiction is also predicated upon the Death on the High Seas Act [2] since the court finds that the MSQ and crew were lost "beyond a marine league from the shore of any State." 46 U.S.C. § 761.

\* \* \*

On April 28, 1960, a meeting took place between representatives of impleaded respondent Bethlehem Steel, a Pennsylvania corporation hereinafter referred to as "Bethlehem," and petitioner Marine Transport Lines, a Delaware corporation hereinafter referred to as "MTL." At the meeting, Bethlehem agreed in principle to convert a T–2 tankship to a molten sulphur carrier. Fundamental to this accord were MTL requirements that the cost of the conversion not exceed $1,650,000 and that the converted ship have a minimum cargo capacity of 15,100 long tons.[3] The latter requirement was part of a long-term tanker consecutive voyage charter party [4] executed as of April 8, 1960 between MTL and the impleaded respondent, "petitioner" Texas Gulf Sulphur Company, a Texas corporation hereinafter referred to as "TGS."

Subsequent to the reaching of the agreement, petitioner Marine Sulphur Transport Corporation, a Delaware corporation and wholly owned subsidiary of MTL [hereinafter "MSTC"], purchased from the Humble Oil Company the Esso New Haven,[5] an all welded T2–SE–A1 tanker of 7240 gross tons and 4057 net tons, with a length of 504 feet, breadth of 68.2 feet and depth of 39.2 feet. This ship was built in 1944 by the Sun Shipbuilding and Drydock Co. of Chester, Pennsylvania.

sighting during both search phases was computed to be 95% for a vessel, 70% for a metal lifeboat and 65% for a liferaft. The U. S. Navy conducted an underwater search for the vessel's hulk during the period of 20 February through 13 March in an area from the shoals to the 100 fathom curve between Key West and 24°35'N, 83°30'W, using six Navy vessels for 523 hours on the scene and 17 aircraft sorties flying 57 hours with possibility of detection of 80% for the hulk. During this period, additional debris was recovered and identified as coming from the MARINE SULPHUR QUEEN. At 1740 EST, 14 March 1963, having received negative reports from all participating units, the search for the vessel was discontinued.

\* \* \* The material recovered and identified as from the MARINE SULPHUR QUEEN consisted of 8 life jackets, 5 life rings, 2 name boards, 1 shirt, 1 piece of an oar, 1 storm oil can, 1 gasoline can, 1 cone buoy, and 1 fog horn. This material was deposited with the Coast Guard at Miami, Florida and later shipped to Washington, D. C. where it was examined by experts from the Bureau of Standards, the Coast Guard, and the Bureau of Fisheries. The consensus of opinion was that possibly two life jackets had been worn by persons and that the shirt tied to a life jacket had also been worn by a person. Numerous tears on the life jackets indicated attack by predatory fish. Further examination was made of certain of the debris by the Federal Bureau of Investigation who determined that the shirt bore no laundry marks, visible or invisible, and that no trace of sulphur particles was evident on any of the material. Visual examination of the material disclosed no trace of either explosion or fire.

2. See generally Doyle v. Albatross Tanker Corp., 367 F.2d 465 (2d Cir. 1966).

3. See Report of Meeting—Marine Transport Line T2 Sulphur Carrier Conversion, signed by J. N. S[hrader] and dated April 29, 1960, p. 1 in Claimants' Exhibit 261. In addition to these fundamental requirements, the agreement was subject to certain preliminary conditions: (1) Approval of the plans and specifications by TGS. (2) Checking of the plans and specifications by George G. Sharp Co., Naval Architects & Engineers. (3) Finalization of a contract between MTL and TGS. (4) Final contract between MTL and Bethlehem. (5) Finalization of MTL's financing arrangements. See *id.,* p. 5.

4. Petitioners' Exhibit 17. See p. 3.

5. See Claimants' Exhibit 260.

The design of such T–2 tankers, however, had proven from the beginning to be unreliable, to say the least. In January, 1943, the Schenectady broke in two in port, and by July, 1946, a total of 15 T–2's had experienced Class I Casualties,[6] while numerous others had experienced lesser fractures. Indeed, a T–2 tanker, the Pine Ridge, broke up in December, 1960 while the Esso New Haven was still in the process of conversion at Bethlehem's Baltimore shipyard.[7]

The original concept of the T–2 design envisioned distribution of the cargo (petroleum) throughout the spaces, port to starboard. Nevertheless, the transformation of the Esso New Haven into the MSQ contemplated removal of the original T–2 centerline tanks and replacement of them with a single independent, sulphur-carrying tank, some 306 feet long, 30 feet, 6 inches wide and 33 feet high—such tank being internally divided by sulphur-tight transverse bulkheads into four tanks with No. 1 83 feet long, Nos. 2 and 3 73 feet long, and No. 4 77 feet. The remaining original wing tanks were to be used only for ballast. Pursuant to this basic concept, Bethlehem had drawn up Plan 43933, Alt.0 [8] which it submitted in May, 1960 to MTL, TGS, the American Bureau of Shipping [hereinafter "ABS"] [9] and the Coast Guard [10] for consideration. Installation of the 306-ft. tank necessitated, in effect, the gutting of the ship, and Plan 43933, Alt.0 accordingly provided, among other things, for the removal of nine transverse bulkheads located at frames 47, 50, 53, 56, 59, 62, 65, 68 and 71. There were not to be any complete or partial bulkheads connecting the structure of the cargo tank to the ship's structure. As agreed upon, MTL submitted this Plan to the George G. Sharp Co., which thereafter reported to MTL on May 17, 1960 as follows:

A preliminary study of [Plan 43933, Alt.0] indicates the design to be deficient in transverse strength. All the main transverse bulkheads in the center tanks of the original tanker have been removed. *We believe it will be necessary to restore at least three of those bulkheads* and divide the sulphur tanks into two or three longitudinal tanks with cofferdams between. Longitudinal top and bottom girders and transverses in way of the sulphur tanks have been reduced below what is considered good practice. It may be possible to make up this deficiency by increased thickness of materials in these structural members, but this will require a detailed study. *Correction of the above deficiencies will result in the reduction of the specified cargo deadweight of from 3 to 5%.*[11]

As soon as it received this report, MTL forwarded a copy to Bethlehem with a cover letter stating:

* * * The remarks contained [in this report] are quite disturbing to us; however, we feel that from our preliminary discussions you will be able to meet all necessary classifications and Coast Guard requirements in

6. See Final Report of a Board of Investigation (convened by order of the Secretary of the Navy) To Inquire Into the Design and Methods of Construction of Welded Steel Merchant Vessels [Claimants' Exhibit 343] 88–101 (1946). See also Trial Minutes, pp. 1139–45.

7. One method employed to reduce serious hull fractures on T–2 tankers was to strap the hull with "crack arresters", and the Esso New Haven apparently had been outfitted with eight such arresters.

8. See Claimants' Exhibit 364.

9. The ABS is a marine classification bureau entitled to recognition by agencies of the U.S. Government. See 46 U.S.C. § 881.

10. The Coast Guard is a branch of the armed forces of the United States with a primary responsibility to administer laws and promulgate and enforce regulations for the promotion of safety of life and property on the high seas and on waters subject to the jurisdiction of the United States. See 14 U.S.C. §§ 1, 2.

11. Emphasis added. Letter from Sharp Co. naval architect L. Hansen to Dr. C. Y. Chen of MTL. See Claimants' Exhibits 267B (Part I) and 364.

order that we may guarantee our Charterer [TGS] the specified deadweight carrying capacity of not less than 15,100 longtons of molten sulphur.[12]

A day earlier, on May 16th, J. N. Shrader of Bethlehem had encountered a similar negative reaction to Plan 43933, Alt.0 when he met with the ABS.[13] Thereafter, on May 20th, representatives of Bethlehem again met with the ABS. Bethlehem's "basic approach was to convince the Bureau that the sulphur tank, even though attached to the ship by bolted connections (plus being welded solid to the ship's structure at the tank's mid point) actually contributes a great deal of strength by becoming part of the ship's hull girder."[14] This "approach" was clearly dictated by the overriding economic concern that minimum cargo capacity not go below the specified 15,100 tons. In any event, the ABS acquiesced in this approach after the inclusion of certain features in the design.[15] Bethlehem then drew up its revised Plan 43933, Alt.1 [16] which retained the basic single tank structure, but which added a complete transverse bulkhead at frame 59 and diaphragm bulkheads at frames 53 and 65. Furthermore, the wing tank transverse bulkheads were to be aligned with the cargo tank's transverse bulkheads. This Plan was submitted to

12. Letter dated May 17, 1960 from Robert F. Rae to Ralph Leaf, Ass't Gen'l Mgr. of Bethlehem's Shipbuilding Division, in Claimants' Exhibit 267B (Part I).

13. Shrader reported on the meeting as follows:
 * * * Mr. Little and Mr. Foley [of of the ABS] feel that our changes to the hull structure in the existing centerline cargo tanks are not adequate to maintain local transverse and longitudinal strength. Their initial thoughts are to retain three (3) complete transverse bulkheads, thereby making two cargo tank units instead of one, and to have deeper bottom and deck longitudinals than those presently proposed. These changes would necessarily reduce the cargo cubic available.
 I pointed out that the new tank foundations would assist in breaking the span of the bottom transverses and the cargo tank itself would, even though bolted, act to maintain rigidity. Mr. Little feels that this is not the case and since the tank is bolted with slip joints no credit can be given to it as far as strength is concerned.
 Upon being questioned about acceptability of an integral tank, as in our Proposition #2 to Marine Transport, Lines, Mr. Little said that the Bureau would have no objection, although they would watch it very closely.
 Mr. Little said that the Bureau would take no further action on the structure until we have reviewed our design and talk to them again.
 Report of Visit to American Burau [sic] of Shipping New York Office, dated May 17, 1960, in Claimants' Exhibit 267B (Part I).

14. Marine Transport Lines T2 Sulphur Carrier Conversion—Report of Meeting, dated May 23, 1960, p. 1 in Claimants' Exhibit 267B (Part I).

15. a. "Transverse bulkhead 59 must be made tight all around the tank, thereby making (along with the welded portions of the foundation) the central anchorage point of the tank structure.
 b. Provide partial unstiffened flat plate bulkheads outboard of the tank structure port and starboard at frames 53 and 65. These will act to transmit the tank and cargo weight into existing wing tank structure. This and item (a) above would also assist the hull structure by breaking up the span of the CVK.
 c. To assist in supporting the tanks, provide bolted expansion connections port and starboard between the tank structure and ship's longitudinal bulkheads at frames 47, 50, 56, 62, 68, 71. Since transverse and vertical expansion are slight, these connections need allow only for longitudinal expansion.
 d. Since the sulphur tank centerline swash bulkhead is to act as an extension of the CVK, additional supports (struts) must be provided between it and the tank's longitudinal stringers to make the bulkheads more rigid.
 e. * * * all of the cut-outs in the bottom transverses (for longitudinal framing) will have to be plated over. Small openings at the bottom will be allowed for drainage."
 Id., p. 2.

16. See Bethlehem's Exhibit A.

MTL, MSTC, TGS and the ABS and Coast Guard for consideration. There were no dissenters. On August 9, 1960, MSTC entered into a contract with Bethlehem for the conversion of the Esso New Haven into the MSQ,[17] and this process was completed by January 20, 1961.

Removal of the original centerline tanks and all of the transverse bulkheads in their way did not provide enough space, however, for installation of the 306-ft. tank, the cross section of which was rectangular. Additional structural reductions and/or alterations were required. The height of the center vertical keel from frames 46½ to 72½ was cut down from 7 feet, 6 inches to a constant height of 3 feet, 4 inches, and a 17 in. x 1 in. flange plate was welded to the top thereof. The transverse web frames, or floors, in the bottom of the ship were cut down to a constant horizontal plane of 3 feet, 4 inches above the flat keel plate and were fitted with 15 in. x 1 in. flange plates welded to the top thereof. On either side of the centerline vertical keel, the bottom longitudinals, 7 feet, 6 inches and 15 feet off the centerline, port and starboard, were extended up to this same 3 ft. 4 in. horizontal plane, by the addition of ½ inch plate with an 8 in. x 1 in. flange plate welded to the top. The bottom of the sulphur tank was fitted with five longitudinal stringers of ½ inch plate faced with 8 in. x 1 in. flanges. The longitudinals fitted to the bottom of the tank and the flange plates of the ship's bottom longitudinals were bolted together, except between frames 58 and 60, with a ½ inch thick, 8 in. wide phenolite laminated plastic installed between the flanges as a heat insulator. To permit longitudinal expansion and contraction of the tank, 1 inch bolts were mounted in 1¼6 in. holes in the tank longitudinals and passed through 1¼6 in. x. 3½ in. slots in the insulator and the flanges

in the ship's bottom longitudinals. Although not reflected in the conversion plan, these slots were increased in length to four inches for the last ten feet from either end of the tank. There was a single row of bolts on each of the outboard longitudinals and a double row on the centerline longitudinal. Between frames 58 and 60, a distance of 24 feet, 4 inches, the five longitudinals fitted to the bottom of the tank were welded to the ship's five bottom longitudinals after a plate ½ inch thick was inserted to compensate for the absence of the heat isolating material in these areas.

No precise measurements of the expansion were made during a subsequent test when air temperatures of 240° F. to 252° F. were achieved inside the *empty* tank,[18] but one witness recalled that the ends of the tank had expanded so that the bolts were within ¼ to ⅜ of an inch from the ends of the 4 in. slots. Apparently, no measurements of the expansion were ever made while the tank was full of molten sulphur. During the one test and later at various times while the vessel was in operation, loud noises caused by expansion and contraction of the tank were heard throughout the vessel.[19]

As was required below the tank, the ship's structural members also had to be cut above the tank in order to provide the requisite space. Under the weather deck, the centerline deck longitudinal girder was reduced from its original depth of 5 feet to 2 feet, 8 inches, except between frames 58 to 60 where the original depth was 3 feet, 6 inches. This section was welded directly to the top of the tank. Where this girder was cut to a depth of 2 feet, 8 inches, a 15 in. x 1 in. face flange was welded to the bottom thereof. On the top of the tank at the centerline, bracketed webs ½ inch thick with face plates 8 inches by 1 inch by 12 inches long were fitted at

17. Petitioners' Exhibit 16.

18. The tank had been fitted with steam heating coils in its bottom, sumps, sides and ends.

19. See Claimants' Exhibit 24 at p. 4.

each frame between frames 47 to 71 inclusive except for the welded portion between frames 58 to 60. Again the slotted bolt arrangement was employed, with each connection being made with two bolts staggered on either side of the centerline of the girder.

In summary then, the cargo tank was attached at the bottom to five longitudinal girders and at the top to the centerline deck girder by means of slotted bolts. This unique arrangement was the subject of much expert testimony and criticism and was attacked as to its basic ability to hold in place a tank and cargo of the size and weight specified when the ship worked in a heavy sea.

Continuing with the features of the conversion, a complete watertight bulkhead surrounded the tank at frame 59 so that a void space then existed fore and aft of this bulkhead. Diaphragm plates were fitted between the tank sides and the wing tank longitudinal bulkhead at frames 53 and 65, both on the port and starboard sides. These diaphragm plates were not watertight. They extended from 4 feet, 6 inches above the tank bottom to within 1 foot, 6 inches of the top of the tank. At about the 20 ft. level above the tank bottom, 15 in. x 36 in. access holes, port and starboard, were cut out of the diaphragm plates to permit access along a cat walk, which together with appropriate vertical ladders, permitted personnel to descend from the weather deck to the void space surrounding the tank.[20] On each side of the tank, tank expansion connections consisting of two pieces, one welded to the tank and the other to the wing tank longitudinal bulkhead, were fitted at frames 47, 50, 56, 62, 68 and 71.

As noted previously, the cargo tank was divided internally into four sep-

arate cargotight areas. Each of these four sub-tanks was fitted at the after end with port and starboard expansion trunks which extended through the weather deck into watertight pumphouses.

To reduce thermal losses, the entire tank exterior was insulated with a blanket of Owens-Corning Armaglas PF–335, 4 inches thick on the bottom, sides, ends and around the expansion trunks and 6 inches thick on the top.

\* \* \*

The *Queen* was certificated at Baltimore by the Coast Guard on January 18, 1961 for the carriage of "Grade E liquids at elevated temperatures." She was then put in service transporting molten sulphur from TGS's main storage and loading terminal at Beaumont, Texas to molten sulphur terminals at Carteret, New Jersey and Norfolk, Virginia, as well as other Gulf and East coast ports on occasion. The vessel, which had an estimated life expectancy (by MTL) of 15 years, made only 63 voyages after conversion and prior to February 1, 1963. On that date, loading of molten sulphur[21] commenced at Beaumont. Some 7,828 long tons of dark sulphur were pumped into "tanks" 1 and 2; bright sulphur weiging 7,487 tons was pumped into "tanks" 3 and 4. Total load: 15,-315 long tons.[22] In addition to this cargo, the MSQ had on board 3,830 barrels of fuel and 100 tons of water[23] at the time of departure from Beaumont, 1330 hours (CST) on February 2, 1963. She proceeded to sea under the direction of a pilot, who left the vessel at the Sabine Bar Sea Buoy. Shortly thereafter, Captain James V. Fanning, master of the *Queen,* radioed that the ship had departed the buoy at 1900 CST (on February 2d) via 24.4°N 83.0°W to 24.8°N 80.2°W

20. The void space was approximately two feet wide at the sides of the tank, three feet at the top and six feet at the ends.

21. The temperature of the sulphur was between 273° and 276° F.

22. The court accepts this figure, which is set forth in both the bill of lading and

the weight certificate (Cargo Claimant's Exhibits B and C), for purposes of the cargo claim as opposed to the ship's figure of 15,260 tons.

23. The draft in fresh water was 29 feet, 11 inches forward and 32 feet, 9 inches aft.

to 31.2°N 79.2°W to 35.1°N 79.3°W to Cape Henry, Virginia, with an estimated time of arrival at Norfolk of 12 noon (EST) on February 7th. Captain Fanning had been instructed to give both a 48 hour and a 24 hour advance notice of arrival to the Norfolk agent. No such messages were ever received. The only other (and last known) message from the MSQ was a personal one from a member of the crew which was transmitted at 1:25 a. m. (EST) on February 4th and received by RCA Radio. At this time, the estimated position of the ship was 25°45′N 86°W based on an estimated speed of 14.5 knots. RCA made two unsuccessful attempts to contact the Queen, the first commencing at 11:23 a. m. (EST) on February 4th. At that time, the vessel would have been at an estimated position of 24°40′N 83°19′W if she had continued along.

The hindcast prepared by the United States Navy Oceanographic Office on the weather conditions prevailing along the projected track of the MSQ during the period of 2000 hours (EST) on February 3 to 1300 hours (EST) on February 4 for the area between 88°W and 82°W indicates that the ship may have encountered seas with a maximum wave height of 16.5 feet slightly abaft the port beam. The winds would have been generally northerly in direction, also slightly abaft the port beam, with a maximum force of 25 knots and gusting to 46 knots. The vessel's period of roll was calculated to have been 8.5 seconds. The period of the waves was included in the hindcast and was within ten percent of the MSQ's period of roll.

As with most, if not all, tragic and seemingly esoteric happenings, the loss of the Queen has precipitated a rash of theories incorporating both physics and metaphysics in varying degrees.

The two petitions herein were filed on March 1, 1963 and July 9, 1964.[24]

In a proceeding for exoneration from, or limitation of, liability, the petitioners are required to prove that the given ship, in this case the Queen, was seaworthy when she broke ground and to set forth facts known to them which might have a bearing on the cause of the loss. The claimants have the burden of proof of establishing either unseaworthiness or negligence, and if they do this,[25] the petitioners must then show that they are entitled to limitation because of a lack of privity or knowledge as to the condition of unseaworthiness or negligence. See Petition of Moore-McCormack Lines, Inc., 147 F.Supp. 816 passim (S.D.N.Y.1956); Petition of Long, 293 F.Supp. 172, 173–174 (S.D. N.Y.1968). See also Petition of the United States, 303 F.Supp. 1282, 1302–1303 (E.D.N.C.1969); Pre-Trial Order herein, page 4.

The burden of proof with regard to the impleaded respondents Bethlehem and TGS is on the death claimants.

Once it is prima facie that a cargo delivered on board as attested to in a bill of lading is lost, which is the case herein, the "carrier" is required to prove that it exercised due diligence to make the ship seaworthy or that the loss was the result of a cause excepted from liability by the Carriage of Goods by Sea Act [hereinafter "Cogsa"]. See, e. g., Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426, 429 (2d Cir. 1962). In this case, however, petitioners raise a threshold issue of whether the cargo claimant, the United States Fire Insurance Company—a New York corporation hereinafter referred to as "FIC", is entitled to subrogation under its ocean marine cargo insurance policy with TGS[26] and/or "subrogation receipt" dated

24. While denying that it is an "owner" within the meaning of the Limitation of Liability Act, TGS filed its petition in the event that the court were to find otherwise.

25. Failure to carry this burden would entitle petitioners to exoneration.

26. Cargo Claimant's Exhibit D.

March 4, 1963.[27] The burden of proof with regard to this issue is on FIC.

A trial was held on the sole issue of liability with petitioners MSTC, as owner, and MTL, as demise or bareboat charterer,[28] presenting evidence in an attempt to substantiate their contentions that the MSQ was seaworthy in all respects; that the vessel's loss and the resulting loss of her crew and cargo were not caused or contributed to by any fault or neglect on their part, but rather by a peril of the sea or act of God; and that they lacked privity or knowledge with respect to any fault or neglect.

Zeroing in on the death claimants' basic contentions[29] by reducing the choke on their shotgun, they argue that TGS was a joint venturer with MTL and MSTC and therefore must also stand in the same position as those two petitioners; that the plan concocted by Bethlehem at the behest of MTL to convert a wasted T–2 tanker into a carrier of TGS's exotic cargo was negligent both in concept and implementation, for which TGS and Bethlehem are liable; that TGS and Bethlehem are liable for breach of an implied warranty of fitness and suitability and under the concept of strict tort liability; and that the MSQ was negligently maintained and operated by the petitioners (including TGS) and Bethlehem. The death claimants further contend that the *Queen* must be presumed to have been unseaworthy by virtue of its otherwise unexplained loss under conditions of wind and sea which she was designed to meet; that there was statutory fault requiring application of the *Pennsylvania* Rule; and that the MSQ was unseaworthy due to structural weakness and to a number of dangerous conditions inherent in the design and purpose of the conversion.[30] The death claimants argue that the petitioners are not entitled to exoneration due to a failure to prove that the MSQ was seaworthy in all respects and that the petitioners are not entitled to limitation of liability because they were privy to the negligence and unseaworthiness which caused the loss of the vessel.

The essential points of TGS's defense as impleaded respondent are that it was not a joint venturer with MSTC-MTL, but only a voyage charterer of their vessel; that its cargo was one which is relatively safe to store, handle and carry; and that the loss of the MSQ and her crew and cargo was not caused by negligence or want of care on its part, but rather by a condition or cause unknown to TGS.

Bethlehem argues that it carried out the conversion in conformity with the best commercial marine practices and with a plan approved by the owner and charterer of the vessel; that the design was approved by the ABS and Coast Guard, which granted the MSQ a certificate; and that the cause of the loss of the ship is utterly unknown but could have been any one of a number of natural phenomena including a meteorite or tsunami or "freak sea." Bethlehem further contends that it is not liable in the absence of any showing of negligence on its part which proximately caused the loss and that the doctrines of res ipsa loquitur and strict tort liability do not apply to it in this case.

\* \* \*

The evidence in this case makes it abundantly clear, and the court so finds,

---

27. Cargo Claimant's Exhibit A. On that date, FIC indemnified TGS for the loss of its cargo in the amount of $428,820.

28. See Petitioners' Exhibit 23.

29. Essentially similar arguments are made by FIC.

30. Death claimants allege, for example, that there was a continual potential for explosion in that two explosive gases—hydrogen sulphide and carbon disulphide—which tend to be liberated from molten sulphur, especially when it is agitated, and explosive sulphur dust permeated the void spaces due to an inadequate ventilation system and that the resultant gaseous mixtures were susceptible to ignition at any time by recurring fires on the surface of the molten sulphur and in the insulation surrounding the tank.

that petitioners MSTC and MTL have failed to sustain their initial burden of proving that the MSQ was seaworthy when she departed Beaumont on February 2, 1963. The court makes the following specific determinations:

## I.

As part of its responsibility "for the promotion of safety of life and property on the high seas and on waters subject to the jurisdiction of the United States," the Coast Guard is required to certify that the hull of a given vessel "is of a structure suitable for the service in which she is to be employed." 46 U.S.C. § 391(b). The Coast Guard has promulgated rules and regulations for tank vessels [31] pursuant to Section 391a(2) of Title 46, U.S.C., which provides, in part:

> In establishing such rules and regulations the Commandant of the Coast Guard may adopt rules of the American Bureau of Shipping or similar American classification society for classed vessels insofar as such rules pertain to the efficiency of hulls and the reliability of machinery of vessels to which this section applies.[32]

Section 31.10–1 of Title 46, C.F.R. reads as follows:

> * * * (a) In the inspection of hulls, boilers, and machinery, the current standards established by the American Bureau of Shipping and designated "Rules for Building and Classing Steel Vessels" respecting material and construction of hulls, boilers, and machinery, except as otherwise provided for by law and regulations in this chapter, shall be accepted as standard by the Coast Guard.
>
> (b) The current standards established by the American Bureau of Shipping in effect at the time of

construction of the vessel, or otherwise as applicable, shall be used. The book "Rules for Building and Classing Steel Vessels" is usually published annually * * *

> (c) The approved plans and certificate of the American Bureau of Shipping, or other recognized classification society for classed vessels, may be accepted by the Coast Guard as evidence of the structural efficiency of the hull and reliability of machinery of vessels subject to the regulations in this subchapter, except as otherwise provided for by laws and regulations in this chapter.

The foregoing provisions make it clear that ABS standards and rules are entitled to, and do have, statutory effect.

The ABS standard in 1959–60 with regard to strength bulkheads was that "[a]ll vessels should have *complete* transverse bulkheads extending to the Strength Deck, spaced not over 100 feet apart." [33] A number of witnesses, including Edward P. Rahe of Bethlehem's Shipbuilding Division, recognized this 100-ft. rule as the standard for the spacing of transverse bulkheads. Indeed, prior to conversion, the distance between complete transverse bulkheads in the Esso New Haven was 36 feet, 6 inches. After conversion, the MSQ had one transverse bulkhead at frame 59. This bulkhead was some 159 feet from the next complete bulkhead forward and 150 feet from the next complete one aft. The court finds that the diaphragm bulkheads installed at frames 53 and 65 in no way qualified as "complete transverse bulkheads."

Although the ABS approved the bulkhead arrangement of Plan 43933, Alt.1,[34] the court finds that the ABS should have adhered to its initial reaction to the

---

31. See generally Subchapter D of Title 46, C.F.R.

32. See also 46 U.S.C. § 369(b).

33. Emphasis added. ABS, Rules for Building and Classing Steel Vessels [Claimants' Exhibit 362] 33 (1959); ABS, Rules

for Building and Classing Steel Vessels [Claimants' Exhibit 362A] 35 (1960).

34. The Coast Guard had, as usual, predicated its approval on ABS acceptance. See Claimants' Exhibit 24 at pp. 35–36.

conversion, namely, that there be at least three complete transverse bulkheads,[35] and that by not doing so, the ABS violated its own rule. It is true that this rule further provides that where "spaced not over 100 feet apart . . . is impracticable, the transverse strength and stiffness of the hull is to be effectively maintained by deep webs or partial bulkheads," and the ABS apparently relied on this provision in approving the diaphragm plates. But the court finds that installation of at least three complete transverse bulkheads was not impracticable[36] and that the transverse strength and stiffness of the T-2 hull were not maintained by the cutting down of the web frames and the installation of the diaphragm bulkheads.

Traditional practice has apparently been for the Coast Guard to adhere to the ABS rules and regulations regarding hull structure, and the court therefore finds that this adherence gives the 100-ft. rule statutory effect. But even if there were no such adherence, the court finds in view of all the expert testimony in this case that this rule should be followed as a rule of thumb. "Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission." The T. J. Hooper, 60 F.2d 737, 740 (2d Cir.), cert. denied sub nom. Eastern Transportation Co. v. Northern Barge Corp., 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932); Coleman v. Jahncke Service, Inc., 341 F.2d 956, 959, rehearing denied, 348 F.2d 868 (5th Cir. 1965), cert. dismissed sub nom. Jahncke Service, Inc. v. Greater New Orleans Expressway Commission, 382 U.S. 967, 86 S.Ct. 525, 15 L.Ed.2d 463 (1966).

■ Violation of the 100-ft. rule amounted to statutory fault[37] requiring the petitioners MSTC and MTL to show that this violation "not merely * * * might not have been one of the causes, or that it probably was not, but that it could not have been." The Pennsylvania, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873). See Waterman Steamship Corp. v. Gay Cottons, 414 F.2d 724, 737 (9th Cir. 1969). This MSTC and MTL have failed to do, and they are therefore not entitled to exoneration from liability. The rule with respect to the spacing of bulkheads is aimed, among other things, at minimizing the effect of racking stresses. The court finds that the replacement of the mine original T-2 transverse bulkheads with the one at frame 59 and with the diaphragm plates substantially weakened the *Queen*'s ability to cope with racking stresses which result from working in a heavy sea like the one in the Gulf of Mexico on February 3–4, 1963.

■ The court further finds that both MSTC and MTL were well aware of the specifics of the conversion plan,[38] including the number and spacing of bulkheads, and that they were thus privy to, and knew of, the non-adherence to the 100-ft. rule. This was pointed out, in effect, to MTL by its consultants —Sharp & Co.—in the letter of May 17, 1960. MSTC and MTL are therefore not entitled to limitation of liability.

## II.

■ MSTC and MTL had an absolute duty to furnish a vessel reason-

---

35. See supra n. 13.

36. The only apparent reason for the decision not to employ at least three complete bulkheads was the heretofore mentioned one of economy of cost and a desire to maximize cargo capacity. Cf. Sharp Co. letter, supra n. 11.

37. Cf. Belden v. Chase, 150 U.S. 674, 698, 14 S.Ct. 264, 37 L.Ed. 1218 (1893); Commercial Transport Corporation v. Martin Oil Service, Inc., 374 F.2d 813, 819 (7th Cir. 1967).

38. MTL, which acted as MSTC's "agent" during the period of the conversion, assigned its Assistant to the President in Charge of Engineering, Robert F. Rae, to oversee the operation. Rae in turn assigned port engineer Raymond McGraw to be present at Bethlehem's shipyard throughout the conversion process.

ably fit for its intended use. "The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960). However, MSTC and MTL did not live up to their absolute duty. Perhaps the clearest indictment of the design of the MSQ is the Marine Board of Investigation's following recommendation:

> In the future, the same conversion of another T–2 type tanker should not be approved. Further, it is recommended that no other conversion of this type vessel should be approved which deviates from the originally designed features for the carriage of normal petroleum products.[39]

"The subsidiary questions leading to ultimate conclusion of seaworthiness are * * * what is the vessel to do? What are the hazards, the perils, the forces likely to be incurred? Is the vessel or the particular fitting under scrutiny, sufficient to withstand those anticipated forces? If the answer is in the affirmative, the vessel (or its fitting) is seaworthy. If the answer is in the negative, then the vessel (or the fitting)

is unseaworthy no matter how diligent, careful, or prudent the owner might have been." Walker v. Harris, 335 F.2d 185, 191 (5th Cir.), cert. denied, 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342 (1964). The answer herein is clearly negative; the court finds that the *Queen* was intrinsically unseaworthy[40] and not reasonably suitable for her intended service. The standard for the transverse strength of a T–2 tanker is, of course, a standard T–2. The primary transverse members of such a ship are the transverse bulkheads and web frames. One expert calculated that removal of the nine bulkheads resulted in an initial transverse bulkhead area reduction of 69.33 percent. Web area reduction, according to his figures, amounted to 88.71 percent.[41] Allowing full credit for the new bulkhead at frame 59 and the diaphragm plates installed at frames 53 and 65, he calculated the total area reduction of transverse members to be 43.7 percent.[42] The court finds that this reduction in the total area of the transverse members resulted in a very substantial weakening of the transverse strength of the original hull of the MSQ. In addition, the court finds that the cargo tank and the diaphragm bulkheads added little, if anything, to the transverse strength of the vessel.[43]

---

39. Claimants' Exhibit 24, p. 37. The Commandant concurred in the recommendation that the same conversion not be approved again, but he ruled that the further recommendation regarding any deviation from the original design features required "considerable qualification." See Claimants' Exhibit 25 at p. 6.

40. The MSQ was unseaworthy in a number of respects: While provision was made for longitudinal expansion of the cargo tank, there was no provision for transverse and vertical thermal expansion and the stresses resulting therefrom. The concentration of the entire weight of the cargo within approximately fifteen feet on either side of the centerline of a vessel originally designed for even cargo distribution throughout the spaces, port to starboard, reduced the ship's radius of gyration, and its period of roll was therefore faster than another vessel with the same

metacentric height. Corrosive (and conceivably explosive) solid sulphur ranging in texture from fine dust particles to solid chunks coated most of the interior of the vessel surrounding the cargo tank. There was no adequate system for warning the crew of the presence of toxic and potentially explosive mixtures of hydrogen sulphide and carbon disulphide within both the cargo tank and the void spaces. The 6-in. and 4-in. vents for venting off these gases from the surface of the molten sulphur were ineffective on the ill-fated voyage as a result of filling the sub-tanks into the expansion trunks.

41. See Trial Minutes, p. 851.

42. See *id.* at 858.

43. Concentration of the entire cargo within a transverse distance of less than half of the beam of the ship did not serve to lessen the shear stress on the bottom trans-

The petitioners make much of the fact that the *Queen* was constantly attended and scrutinized by a "host of individuals," including officers of MTL, marine superintendents, port engineers and various technicians, as well as inspectors from the Coast Guard and ABS.[44] Of course, the attendance of a number of these people (e. g. the Coast Guard inspectors) was statutorily required from time to time. But the very fact that MTL, for example, required the continuing presence of technicians implies, in itself, the uniqueness of the MSQ's design and the concern for its performance. The short history of the vessel shows that it was prone to fires,[45] for one thing.

The petitioners and impleaded respondents speculate that the *Queen* fell victim to a "freak sea" or to the weather in the Gulf of Mexico on February 4, 1963, which they argue represented a peril of the sea. The court specifically rejects the conjecture regarding a freak sea. There is no evidence whatsoever before the court indicating that other ships in the Gulf at the same time as the MSQ experienced such wave formation(s). As for the weather during the early hours of February 4th, the court finds that strong winds and rough northerly seas existed, but that this condition was by no means extraordinary,[46] nor did it represent a situation which a seaworthy ship could not have been reasonably expected to weather. Indeed, some 24 ships reporting weather observations for that date to the Weather Bureau apparently did cope with the conditions.[47] The vessel Texas Gulf Sulphur No. 1—a smaller liberty ship also converted to transport molten sulphur, albeit with four complete transverse bulkheads—managed to sail high and light to Houston, Texas along a course somewhat paralleling (in the opposite direction) the probable one of the *Queen*.[48] The Smooth Deck Log Book of the Texas Gulf Sulphur No. 1 lists winds ranging in force from 6–7–8 on the Beaufort scale during the period of time 0100–1200 hours on February 4th.[49] The vessel's master, Bjorneby, testified, however, that these ratings were just estimates,[50] although they are essentially in conformity with those of the hindcast. Captain Bjorneby also testified that he had sailed through such winds many times, including the voyage in point, without suffering any damage.[51] He indicated that the obviously desirable condition for experiencing such weather was laden [like the *Queen*] rather than light.[52]

The petitioners argue that, in view of the prevailing weather conditions, it is quite likely that capsizing brought about the sudden loss of the MSQ.[53] There is logic in this conjecture when one considers the weather factor along with the fact that a distress signal can often be transmitted within a matter of seconds. However, even if capsizing were the actual cause of the disaster, *although the court makes no such finding*, such an occurrence would be attributable to the unseaworthy condition created by the conversion concentration of cargo within some 15 feet on either side of the centerline which effected a reduction of the original period of roll of 12.1 seconds for a T–2 hull to 8.5 seconds for the *Queen*. The calculated period of waves was within ten percent of this converted period of roll.

verse webs, which had been cut down to accommodate the cargo tank in the first place.

44. See generally Petitioners' Post-Trial Brief, pp. 12–28.

45. See Claimants' Exhibit 24, pp. 9–10.

46. It seems unlikely that a member of the crew of the MSQ would send a personal radio message at 1:25 a. m. if the ship were experiencing a raging storm.

47. Cf. Claimants' Exhibit 356.

48. See Petitioners' Exhibit 1.

49. See Petitioners' Exhibit 28.

50. Trial Minutes, p. 1316.

51. *Id.* at 1314–15.

52. See *id.* at 1310.

53. Petitioners' Post-Trial Brief, p. 33.

Then again, a conclusion the logic of which is more compelling in view of all the known facts is that the MSQ suffered a sudden and massive structural collapse. But be that as it may, this court concurs in the repeated representation of Bethlehem that no one knows *how* the ship was lost.

In a case involving the unexplained loss of a fishing boat, the Court of Appeals for the Ninth Circuit affirmed the trial court's conclusion that "[t]here is no presumption of unseaworthiness of the vessel since there [was] no evidence indicating either negligence or unseaworthiness * * * at or prior to the time of the loss." Walston v. Lambertsen, 349 F.2d 660, 661 (9th Cir. 1965), cert. denied, 382 U.S. 980, 86 S.Ct. 553, 15 L.Ed.2d 470 (1966). Relying on Admiral Towing Co. v. Woolen,[54] the Court in *Walston* expounded the nature of the permissible presumption in a case like this as follows: "* * if a claimant establishes that a vessel is unseaworthy, the trial court may presume that the unseaworthiness was the proximate cause of the sinking, otherwise unexplained, of a vessel in calm seas. * * * [This] presumption * * * has been indulged only when the claimant has been able to establish to the satisfaction of the trial court that the vessel was unseaworthy at the time it departed on its last voyage."[55] 349 F.2d at 662.

The rule in this Second Circuit permits the presumption of causation. It may also encompass the existence of unseaworthiness[56] as well. See Federazione Italiana Dei Consorzi Agrari v. Mandask Compania De Vapores, S.A. [hereinafter "The Perama"], 388 F.2d 434 (2d Cir.), cert. denied, 393 U.S. 828, 89 S.Ct. 92, 21 L.Ed.2d 99 (1968); South, Inc. v. Moran Towing & Transportation Co. [hereinafter "The Vega"], 360 F.2d 1002 (2d Cir. 1966).

While the losses of the Perama and Vega and the boat in *Walston* all occurred during fair weather and calm seas, this court is aware of no valid reason for not applying the same rule herein where the MSQ was lost under conditions which the court finds a seaworthy vessel should have been reasonably expected to weather. Cf. Walker v. Harris, 335 F.2d at 193; Brinegar v. San Ore Construction Company, 302 F.Supp 630, 634 (E.D.Ark.1969).

The presumption of causation is rebuttable and therefore operates in the same manner as the *Pennsylvania* Rule. That is, if and when claimants prove that a particular ship was unseaworthy when she last broke ground, which is clearly the case here, the owner or party seeking to avoid liability can rebut the presumption by showing that the unseaworthiness could not have caused the loss. Here again, the court finds that MSTC and MTL not only failed to rebut the presumption, but they also were unable to show that they were not privy to, or knowledgeable of, the unseaworthiness of the *Queen*.

Thus, in addition to, and independent of, the court's conclusion that the petitioners MSTC and MTL are not entitled to exoneration from, or limitation of, liability on the basis of the statutory fault, the court hereby concludes that the two petitioners are not entitled to exoneration or limitation as a result of the proven unseaworthiness of the MSQ.

### III.

A minimum cargo capacity of 15,100 long tons of molten sulphur had been the

---

54. 290 F.2d 641 (9th Cir. 1961).

55. The underlying policy for this rule was stated as follows:

 The sea itself contains many hazards, and an inference of liability of the shipowner for the mysterious loss of his vessel should not be lightly drawn. (footnote omitted) 349 F.2d at 662.

56. For a case involving the unexplained loss of a ship where the trial court clearly presumed that the vessel was unseaworthy and that the loss was caused by this unseaworthiness, see Martin & Robertson, Ltd. v. The Steamship Barcelona, 1968 A.M.C. 331 (S.D.Fla.1967).

uncompromising requirement for the conversion of the Esso New Haven. The master of the *Queen* was issued a temporary stability letter[57] and "Preliminary Trim, Stability & Loading Stress Booklet,"[58] approved by the Coast Guard on January 19, 1961 pursuant to 46 C.F.R. § 31.10–30(d)(2). The Booklet listed an optimum cargo tonnage of 15,211 long tons based on 20.08 cubic feet of molten sulphur per ton at 275° F. Full load displacement was calculated to be 21,980 tons, with a full load draft of 30 feet, 3 inches. The cargo tonnage figure of 15,211 was exceeded on no less than *45* of the 64 voyages of the MSQ, including the ill-fated sixty-fourth.[59]

Both the temporary stability letter and Stress Booklet stated that a sagging (or hogging) numeral in excess of 100 was not authorized. Nevertheless, calculations for the last 60 voyages of the MSQ (for which printed Port Log-Vessel Reports were used) indicate that, while loaded, the sagging numeral for the vessel exceeded 100 on 52 occasions, varying from 100.55 to 104.66. The hogging numeral on all fully loaded voyages varied from 47.63 and 55.01. The calculated stress numerals at the time of departure from Beaumont on February 2, 1963 were 54.37 in hog and 101.01 in sag.

According to the figures contained in the Vessel Report, the *Queen* had a mean draft in fresh water at that departure of 31 feet, 4 inches. The equivalent salt water mean draft was 30 feet, 8 inches.

The MSQ was by definition in "coastwise" operation. See 46 U.S.C. § 88. Under the coastwise rules for loading, the ship was some three inches above her marks when she last broke ground on February 2nd, and the court thus finds that her loading did not amount to a statutory violation,[60] although she was clearly loaded more than to the gills on that date—i.e. into the expansion trunks.

The court concludes, however, that the disregard of the optimum tonnage figure[61] set forth in the Stress Booklet on the *Queen*'s last voyage (and on 44 previous voyages) amounted to gross negligence on the part of MTL in view of the unique design of the vessel. To have instigated this design with a cargo capacity requirement of 15,100 long tons and then to have continually exceeded the optimum figure, which was 111 tons in excess of this requirement to begin with, is incomprehensible except in terms of *unacceptable* economic considerations.[62] MTL, as bareboat charterer, certainly cannot be heard to argue that it was unaware of, and therefore not responsible for, MSQ loading practices. Cf. Coryell v. Phipps, 317 U.S. 406, 410, 63 S.Ct. 291, 87 L.Ed. 363 (1943). Its representatives kept a continuing eye on the vessel's operation, and the Vessel Reports, including the one for the last voyage, were generally stamped "received" by MTL within several days of departure from Beaumont.

57. Petitioners' Exhibit 22.

58. Petitioners' Exhibit 21.

59. See the Port Log-Vessel Reports of the MSQ, Petitioners' Exhibit 19.

60. However, the court notes that the vessel was some five inches below her international marks.

61. Even the ship's temperature-corrected tonnage figure of 15,240 was in excess of the optimum figure. See Vessel Report for Voyage No. 64 in Petitioners' Exhibit 19. Moreover, the base ship's figure of 15,260 long tons for February 2, 1963

had been exceeded on only three previous voyages, to wit, the 12th, 16th and 57th.

62. As Judge Weinfeld has so aptly pointed out:
 This Court is unaware of any current authority or doctrine in general maritime law which shifts to the [crew] the burden of the hazards created by the shipowner's endeavors, experimental or otherwise, to increase the productive earning power of his vessel * * * Rodriguez v. Coastal Ship Corporation, 210 F.Supp. 38, 42 (S.D.N.Y.1962).

Contrary to the argument of the petitioners,[63] the court finds that the death claimants did not abandon their claims under the Jones Act, nor were they required to do so. See Doyle v. Albatross Tanker Corp., 367 F.2d 465, 467 (2d Cir. 1966). The Jones Act, of course, created a federal right of action for the wrongful death of a seaman based on the Federal Employers' Liability Act which allows recovery for death resulting "in whole or in part" from negligence. 45 U.S.C. § 51. See, e.g., Ferguson v. Moore-McCormack Lines, Inc., 352 U.S. 521, 523, 77 S.Ct. 457, 1 L.Ed.2d 511 (1957). In order to recover, a claimant is not required to prove common-law proximate causation. Crane v. Cedar Rapids & Iowa City Railway Co., 395 U.S. 164, 166, 89 S.Ct. 1706, 23 L.Ed. 2d 176 (1969); Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493, rehearing denied, 353 U.S. 943, 77 S.Ct. 808, 1 L.Ed. 2d 764 (1957). The Court of Appeals for the First Circuit interpreted *Rogers* as meaning that "only the barest possibility of causation is enough to make out a case for the jury." New York, New Haven & Hartford Railroad Company v. Henagan, 272 F.2d 153, 157–158 (1st Cir. 1959). Despite the Supreme Court's reversal of *Henagan* on the basis of the trial record,[64] the Court of Appeals's assessment of the causation standard for FELA-Jones Act cases has certainly proven perspicacious. See generally 98 A.L.R.2d 653–683; Prosser, Law of Torts 560–561 (3d ed. 1964).

In a Jones Act action based on the negligent loading of the M/V Wingate, the subsequent loss of which "being otherwise unexplained," the Fifth Circuit Court of Appeals reversed the trial court's directed verdict for the defendants, finding that the jury could have inferred that the loss of the vessel and crew was due to the negligent loading. Roth v. Bird, 239 F.2d 257, 262 (5th Cir. 1956). See Roth v. Cox, 210 F.2d 76 (5th Cir. 1954). The Ninth Circuit relied on *Roth* and Schulz v. Pennsylvania Railway Co.[65] in affirming the trial court's denial of a petition for limitation of liability in a Jones Act action sounding in negligence for the disappearance of a tugboat. Admiral Towing Company v. Woolen, supra. See especially 290 F. 2d at 649–652. The Court concluded that:

> \* \* \* the requirement of legal cause can be supplied by inference when, as here, there is negilgence and/or unseaworthiness on the one hand and an unexplained disappearance of a vessel at sea on the other.[66]

The absolute duty of an owner (or bareboat charterer) to furnish a seaworthy ship is "completely independ-

---

63. Compare Petitioners' Post-Trial Brief, p. 59, with Death Claimants' Reply Memorandum, p. 2.

64. 364 U.S. 441, 81 S.Ct. 198, 5 L.Ed. 2d 183 (1960).

65. 350 U.S. 523, 76 S.Ct. 608, 100 L.Ed. 668 (1956).

66. 290 F.2d at 652. Cf. Petition of Risdal & Anderson, Inc., 248 F.Supp. 928 (D. Mass.1966).

Often at least the nature of airplane (and ship) losses is known as a result of a combination of factors including electronic surveillance, possibly eye witnesses and/or survivors and wreckages, and the only thing subject to inference is causation. A good example of such a case is Montgomery v. Goodyear Aircraft Corporation, 392 F.2d 777 (2d Cir.), cert. denied, 393 U.S. 841, 89 S.Ct. 121, 21 L.Ed.

2d 112 (1968). The Court of Appeals in this Circuit has concluded:

Th[e] inability to explain the precise cause of an airplane crash is not a rarity in cases where the members of the crew—who would have been most familiar with the tragic events—have perished. In such instances, the court is required to reconstruct the events leading to the crash from the available evidence (often the silent charred wreckage) and from the reasonable inferences to be drawn from such evidence. We do not blink at the obvious when we say that conclusions thus grounded can never be proven with mathematical exactitude.

Ingham v. Eastern Air Lines, Inc., 373 F.2d 227, 240 (2d Cir.), cert. denied, United States v. Ingham, 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967).

ent of his duty under the Jones Act to exercise reasonable care." Mitchell v. Trawler Racer, Inc., 362 U.S. at 549, 80 S.Ct. at 932. However, breach of the latter duty can aggravate, or lead to, a breach of the former. In view of this and the fact that furnishing a ship which is unseaworthy raises a rebuttable presumption of causation in a case like this, a similar presumption must also arise with regard to negligence. Rebuttal requires a showing that the negligence could not have contributed to the loss of the vessel. Cf. Manning v. M/V "Sea Road", 417 F.2d 603, 610 (5th Cir. 1969). This is, of course, the same test applied to a situation where a ship's loading amounts to a statutory violation (which was avoided in this case only because of the "coastwise" loadline increment). See, e. g., Petition of Long, supra. But be that as it may, MTL has not been able to prove that its loading of the Queen on her last voyage could not have contributed to her demise, especially in view of the intrinsic structural weakness. The Jones Act claims are therefore allowed against MTL.

## IV.

█ Bethlehem's generally excellent trial brief begins, however, with the following non sequitur: "[I]t is difficult to conceive that Bethlehem can be held to have performed its duties in an unreasonable manner in light of the studies and views made and expressed not only by Bethlehem itself but by the owner, the charterer, the user and the two regulatory bodies who are charged with the responsibility and power to ensure the safety and seaworthiness of the American merchant marine. * * * " [67] But Bethlehem and the owner, charterer and user were all in the same boat with regard to the design of the MSQ. Only those few mortals of the ABS actually stood between whatever design Bethlehem settled on and the rubber stamp

of the Coast Guard. Clearly unimpressed at first, the ABS finally succumbed to Bethlehem's "basic approach." To have done so was wrong. But the failure of the Coast Guard and the ABS to live up to their duty to promote the safety of life and property at sea in no way relieves a shipbuilder of its duty to exercise reasonable care in designing and carrying out the conversion of a ship, and the court finds that to have gutted a 16-yr. old tanker of the structurally unreliable T–2 class and then restructured it in disregard of the generally recognized rule for the maximum spacing of complete transverse bulkheads which Bethlehem had previously never exceeded [68] was negligence on the part of Bethlehem. "If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger," and "the manufacturer of this thing of danger is under a duty to make it carefully." MacPherson v. Buick Motor Co., 217 N.Y. 382, 389, 111 N.E. 1050, 1053 (1916). See generally Arnott, Design and Construction of Steel Merchant Ships 55–56 (1955). The court further finds that Bethlehem was negligent in designing the conversion in such a way as to concentrate the entire weight of the cargo within fifteen feet on either side of the centerline, thereby significantly reducing the ship's radius of gyration, as well as tending to increase shear stress on the reduced transverse web frames. Bethlehem was also negligent for not having provided for transverse and vertical thermal expansion of the cargo tank.

Bethlehem's role of designing the conversion and then providing all the labor and materials necessary to carry it out was typical for a shipyard. While Bethlehem may not have laid the keel, the court finds that it launched essentially a "new" ship in view of the uniqueness of the design and the significant alter-

67. Trial Memorandum on Behalf of Impleaded Defendant Bethlehem Steel Corporation [hereinafter "Bethlehem Brief"], pp. 1–2.

68. See Trial Minutes, p. 2008.

ation of both the structure and purpose of the vessel. Sales are, of course, the usual means by which products enter commerce, but products liability, which encompasses users, arises not only as a result of such sales, but also "where a manufacturer has placed a defective article in the stream of commerce by other means." Delaney v. Towmotor Corporation, 339 F.2d 4, 6 (2d Cir. 1964). Cf. Deveny v. Rheem Manufacturing Company, 319 F.2d 124, 130 (2d Cir. 1963).

 The question of the most desirable nomenclature for the manufacturer's liability for defective products—be it "breach of implied warranty"[69] a la the landmark decision of Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960), or "strict liability" as enunciated, for example, in Section 402A of the Restatement (Second) of Torts—is far from settled.[70] See, e.g., Goldberg v. Kollsman Instrument Corporation, 12 N.Y.2d 432, 437, 240 N.Y.S. 2d 592, 595, 191 N.E.2d 81, 83 (1963); Basko v. Sterling Drug, Inc., 416 F.2d 417, 424–428 (2d Cir. 1969). What is settled in this Court, however, is that an action based on such liability does lie in admiralty and under the Death on the High Seas Act. See Krause v. Sud-Aviation, Societe Nationale de Constructions Aeronautiques, 301 F.Supp 513 (S.D.N.Y. 1968); Sevits v. McKiernan-Terry Corporation, 264 F.Supp. 810 (S.D.N.Y. 1966); Montgomery v. Goodyear Tire & Rubber Company, 231 F.Supp. 447 (S.D.N.Y.1964); Middlleton v. United Aircraft Corporation, 204 F.Supp. 856 (S.D.N.Y.1960). The nature of the duty which a manufacturer must live up to is also quite well settled. Section 398 of the Restatement (Second) of Torts, for example, sets forth the duty as follows:

> A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design.

Bethlehem considered its duty as extending to "converting a tanker reasonably safe for its intended use, one which contained no defects. * * * "[71] Of course, this duty to provide a ship free from latent defects and concealed dangers and reasonably fit for its intended use—which the court finds is related to, but not dependent on, the shipbuilder's initial duty to exercise reasonable care in designing and building (or converting) a ship—does not require a shipbuilder to make a ship accident proof. See, e.g., Campo v. Scofield, 301 N.Y. 468, 472, 95 N.E.2d 802, 804 (1950). See also Mitchell v. Trawler Racer, Inc., supra.

 The court finds that Bethlehem, as a result of its negligence in designing the conversion, did *not* provide a ship free from latent and dangerous defects. The court refers, of course, once again primarily to the lack of a sufficient number of complete transverse bulkheads and the placement of the cargo tank vis-a-vis the breadth of the hull—defects which the court has found rendered the *Queen* intrinsically unseaworthy. The court further finds, in view of the fact that Bethlehem designed and carried out the conversion at the behest of MTL and MSTC which were well aware of the

---

69. Bethlehem does not seriously dispute the existence in this case of an implied warranty of fitness and suitability for the MSQ's intended use. See Bethlehem Brief, pp. 35–41.

70. Judge Eschbach and Professor Kessler have done much, however, to place the theories in perspective. See Sills v. Massey-Ferguson, Inc., 296 F.Supp. 776 (N. D.Ind.1969); Greeno v. Clark Equipment Company, 237 F.Supp. 427 (N.D. Ind.1965); Kessler, Products Liability, 76 Yale L.J. 887 (1967).

71. Bethlehem Brief, p. 25.

Plan and in agreement therewith, that these *three corporations* were in pari delicto in this case. The court therefore concludes that justice and logic require that the presumption of causation set forth in *Walston* and *The Perama* and *The Vega* also be applied to Bethlehem. And Bethlehem' has had no more success than MTL and MSTC in convincing this court that the heretofore mentioned serious defects could not have caused the demise of the MSQ. Cf. Rooney v. S. S. Healy Co., 20 N.Y.2d 42, 281 N.Y.S.2d 321, 228 N.E.2d 383 (1967), and the subsequent decisions in Guarino v. Mine Safety Appliances Company, 31 A.D.2d 255, 297 N.Y.S.2d 639 (2d Dep't), aff'd, 25 N.Y.2d 460, 306 N.Y.S.2d 942, 255 N.E.2d 173 (1969). The wrongful death claims are therefore allowed against impleaded respondent Bethlehem.[72]

## V.

 Clause 16A of the open insurance policy dated May 1, 1957 between TGS and FIC reads, in pertinent part:

These Assurers hereby agree to waive all rights of subrogation against the steamer and/or the Assured and/or affiliated and/or associated and/or allied companies and/or corporations in the event that the carrying steamer is owned and/or chartered and/or operated by the Assured and/or affiliated and/or associated and/or allied companies and/or corporations.

The court interprets this clause as meaning that FIC *waives* subrogation *when-ever* the stipulated relationship(s) exist. The court finds, however, that none of these relationships were present in this case.

 As already noted above, TGS was not a joint venturer with MTL (and MSTC), nor is there any evidence before the court indicating that TGS was "affiliated and/or associated and/or allied" with either of those two corporations. The relationship between TGS and MTL was a simple and arm's-length contractual one as evidenced by the charter party. Not even this contractual relationship existed between TGS and MSTC.

In arguing that the requisite affiliation and/or association did exist in this case, MTL and MSTC refer the court to Old Colony Insurance Company v. Jeffery's Mill & Warehouse, Inc., 146 F. Supp. 277 (N.D.Cal.1956). But that case, which also involved a contested waiver of subrogation clause, makes it abundantly clear that the type of business relationship contemplated in a clause like 16A was not present herein. The court listed 16 findings which led it to conclude that "the intimate arrangements between the two concerns were such that [the assured] was, for all practical purposes, if not in complete fact, placed in control of the defendant." 146 F.Supp. at 280. MTL and MSTC also rely on Great American Insurance Company, N. Y. v. Gulf Marine Drilling No. 1, 302 F.2d 332 (5th Cir. 1962). In that case, however, the Court merely held that the defendant was at least operating with one of the three assureds, if not

72. While Bethlehem's liability herein is clear, the court finds that TGS is not liable for the wrongful deaths. It is true that TGS knew of the conversion design, closely followed its implementation and provided technical advice with regard to the nature of molten sulphur. But the role of TGS was essentially that of a spectator with a purely cargo-oriented interest. The court finds that TGS was not a joint venturer with MTL and MSTC because it did not have a stake in the ownership of the MSQ. See Petitioners' Exhibit 17 at p. 45. The death claims against TGS as impleaded respondent are therefore dismissed.

The status of TGS in this case is substantially dissimilar to that alleged on the part of the Union Oil Company in the Torrey Canyon disaster. See generally In re Barracuda Tanker Corporation, 281 F.Supp. 228 (S.D.N.Y.1968). TGS was clearly *only* a time charterer herein and therefore not entitled to petition for exoneration or limitation pursuant to 46 U.S.C. § 183 *et seq*. See In re Barracuda Tanker Corporation, 409 F. 2d 1013 (2d Cir. 1969). TGS's petition is therefore dismissed, and the claims asserted against it therein are also dismissed for the reasons stated above.

more, within the language of the subrogation waiver. See 302 F.2d at 334.

■■ In reference to the essential condition of Clause 16A, namely, "steamer * * * owned and/or chartered and/or operated," it is clear that the MSQ was not owned or operated by TGS. Indeed, MTL and MSTC do not argue otherwise. Furthermore, the court concludes that the only sensible interpretation of the word "chartered", read in the context (and juxtaposition) of both the condition and clause as a whole, is that it really means *demise* or *bareboat* chartered. Cf. The Seatrain-Havana, 103 F.2d 772 (2d Cir.), cert. denied sub nom. Conners Marine Co. v. American Molasses Co., 308 U.S. 580, 60 S.Ct. 98, 84 L.Ed. 486 (1939). Stated another way, there must be the equivalent of ownership of the given steamship, if only pro hac vice on the part of the assured, before subrogation of the assurer's claim against the vessel would be waived. A voyage, or better, time charter like the one herein, for example, does not confer responsibility on the charterer for the manning, victualling, navigation and maintenance of the vessel —that is, the control of a ship upon which liability for the loss or damage of a cargo is predicated. The court thus concludes in this case that neither the *Queen*, nor its operator MTL (or owner MSTC) fell within the purview of Clause 16A of the open policy between TGS and FIC, and there was therefore no waiver of subrogation herein.[73]

The bill of lading in this case provided for coverage by Cogsa, which requires a carrier to exercise due diligence, before and at the beginning of a voyage, to make its ship seaworthy, properly equip it and make the holds and all other parts of the vessel in which goods are carried fit and safe for their reception, carriage, and preservation. 46 U.S.C. § 1303(1).

Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly * * * equipped * * * and to make the holds * * and all other parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation * * *.[74]

■ In a case like this where it has been proven that the ship was unseaworthy when it last broke ground, there is a presumption that the cargo was lost as a result of this unseaworthiness, and the party (or parties) seeking to avoid liability can only do so by showing that the requisite due diligence was exercised or that the loss was the result of one or more of the "uncontrollable causes"[75] set forth in Cogsa. See The Perama, 388 F.2d at 436. The court finds that MTL and MSTC have failed to sustain their burden of proving that they exercised due diligence to make the MSQ seaworthy or that the loss of the cargo

73. Cargo underwriter Charles Oerding testified that the premium payable by TGS under the open policy was 3½ cents per $100 whenever there was *no* waiver of subrogation and that the rate for such a waiver was 5 cents per $100. See Trial Minutes, pp. 1251, 1264. Oerding further testified that the rate payable for the last voyage of the MSQ was .035— i. e. 3½ cents. See Trial Minutes, p. 1263. See also *id.* at 1249, lines 9–14.

The subrogation receipt given by TGS to FIC at the time of indemnification further substantiates the fact that there was no waiver in this case.

FIC argues in the alternative, however, that even if the Clause 16A waiver were operative, FIC became a subrogee as a result of TGS's assignment to FIC of its claim as evidenced by the subrogation receipt. However, in view of its determination above, this court need not specifically determine this issue, although it is questionable whether an operative waiver would inure in this Circuit to the benefit of MTL (or possibly MSTC) in the first place. See The Seatrain-Havana, 103 F.2d at 774.

74. 46 U.S.C. § 1304(1).

75. See 46 U.S.C. § 1304(2). See also Petitioners' Exhibit 17, cl. 23.

was the result of an excepted cause. MTL and MSTC, having been privy to, and knowledgeable of, the unseaworthy design of the MSQ, are not entitled to limitation of liability. The claim of FIC is therefore allowed against both MTL and MSTC.[76]

\* \* \*

In summarizing the foregoing in reference to the various questions raised in the Pre-Trial Order, the court has concluded that the petitioners MSTC and MTL are not entitled to exoneration from, or limitation of, liability, and their petition is therefore denied. On the other hand, as a time charterer, TGS was not entitled under the Limitation of Liability Act to petition for exoneration or limitation, and its petition is therefore dismissed.

The claims arising under the Death on the High Seas Act are allowed as against MTL and MSTC and impleaded respondent Bethlehem, but they are dismissed as against petitioner-impleaded respondent TGS. The claims arising under the Jones Act are allowed as against MTL. The claim arising under Cogsa is allowed as against MTL and MSTC.

All motions, decision of which was reserved at the time of trial, are hereby denied in conformity with this opinion, which represents the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

With regard to the question of damages, the evidence in this case does *not* justify any assessment of punitive damages. Trial of the sole remaining issue of compensatory damages will proceed as soon as counsel can be heard.

Settle an order within ten days.

76. While MTL was the "carrier" in this case within the meaning of 46 U.S.C. § 1301(a), the corporate owner's "duty to make the vessel seaworthy, at least to the point of providing it with sufficient integrity to meet the ordinary perils of the sea, is not delegable to anyone." The Perama, 388 F.2d at 439. In view of MSTC's failure to live up to this duty and its close corporate relationship with MTL, both corporations are jointly liable in this case for the loss of the cargo. Cf. Martin & Robertson, Ltd. v. The Steamship Barcelona, 1968 A.M.C. at 333.