**GREAT AMERICAN INSURANCE COMPANY et al., Plaintiffs,**

v.

**BUREAU VERITAS, Defendant.**

**No. 68 Civ. 4535.**

United States District Court,
S. D. New York.

Feb. 22, 1972.

Wilson & Hopkins, New York City, by William A. Williams, and Walter A. Hopkins, for plaintiffs World Tradeways Shipping Ltd. and The Steamship Mutual Underwriting Assn. Limited.

Haight, Gardner, Poor & Havens, by Charles S. Haight, New York City, for plaintiffs Great American Ins. Co., American Manufacturers Mutual Ins. Co., Aetna Ins. Co., and Hartford Fire Ins. Co.

Hill, Betts & Nash by Edwin Longcope and John F. X. McKiernan, New York City, for defendant.

## OPINION

TYLER, District Judge.

This case arises out of the sinking of a Liberty Ship, TRADEWAYS II, while on a voyage from Antwerp, Belgium to

the Great Lakes ports of this country. The vessel, which was owned by the World Tradeways Corp. ("World Tradeways") and chartered by Midland Overseas Trading Corp. ("Midland"), lost her watertight integrity on October 21, 1965 and sank on the following day with loss of the entire cargo and the lives of 11 members of her crew. Plaintiffs World Tradeways, and the insurance companies, with whom Midland and World Tradeways had policies, have settled the various claims asserted against their clients and now seek, by subrogation, indemnification from the defendant, Bureau Veritas, the ships classification society which had surveyed and classified the TRADEWAYS II just prior to her unfortunate voyage. It is plaintiffs' theory that the defendant in surveying and classifying the vessel undertook to provide services pertaining to the seaworthiness of the vessel. It is further alleged that the fact that the vessel sank in unextraordinary circumstances, and other evidence, show that these services were performed either in negligent fashion or were provided in breach of the defendant's implied warranty of workmanlike service, thereby proximately causing the catastrophe which befell the TRADEWAYS II. This case was tried before this court on May 17, 18 and 19, 1971. By agreement of counsel, the trial was limited to the issue of liability.

Insofar as plaintiffs have failed to meet their burden of proving by a preponderance of the evidence that the alleged breach of warranty or duty was the proximate cause of the sinking, that there were in fact breaches of either warranty or duty, or that the principles of either tort or contract law would entitle them to recovery, judgment is entered in favor of the defendant.

## FACTS

TRADEWAYS II (hereinafter sometimes referred to as "TRADEWAYS") was built under the name WILLIAM H. DALL by the Oregon Shipbuilding Corporation. After 20 odd years of service under varied flags and owners, the AMELIA, as she was then called, was surveyed in August, 1964, by Bureau Veritas for classification purposes. As a result of this "special", or initial classification survey, she was certified and registered in Bureau Veritas' rolls under the classification "Maltese Cross I 3/3 L 1.1".[1] In accordance with the rules of the defendant classification society, a ship in this class must undergo a special survey at least once every 4 years and must have intervening surveys annually in order to maintain classification. The annual survey is a less thorough affair and consists mainly of an external inspection of the hull and outer parts for evidence of damage. The special or classification survey is, of course, a more comprehensive investigation in which the internals of the ship are more carefully inspected.

At some time prior to June 3, 1965, World Tradeways, being then interested in the purchase of the vessel, retained a Mr. Thomas W. Morgan, Consulting Engineer and Marine Surveyor, Vancouver, British Columbia, to survey the AMELIA. Mr. Morgan surveyed the vessel at New Westminster, British Columbia, and submitted a report to World Tradeways on June 3, 1965. Although numerous defects were found, Morgan's report concluded that the vessel was in average condition for a Liberty of her vintage and that if repairs were effected, she might give 8 years of service to her purchasers. The Morgan report was in the sole possession of World

---

1. The meaning of this classification may be broken down as follows. The words "Maltese Cross" are a building mark, an indication that the ship was built under the survey of a recognized classification register, in this case the American Bureau of Shipping. The symbol "I" refers to the design of the vessel's scantlings. "3/3" indicates that the ship is in good condition. The letter "L" is a navigation letter denoting that the ship is intended for deep sea trade. The "1.1" indicates that the hull and the rigging, respectively, are in good condition.

Tradeways, which did not see fit to disclose its findings to Bureau Veritas when the defendant commenced its annual survey three months later. Morgan also reported that the life boats were in "fairly good condition," although he admitted to Bureau Veritas, in correspondence after the sinking, that he had minimized the unsafe condition of the life boats in order not to embarrass the defendant who was responsible for the vessel's classification.

By memorandum of agreement dated July 8, 1965, World Tradeways agreed to purchase the vessel from its then owners, Mar Rojo Naviera, S.A. of Panama. Although the ship was to be sold "as is", it was required that the vessel be delivered to World Tradeways at a United Kingdom or continent port "with present Bureau Veritas class maintained free of recommendations and free of average affecting class." Accordingly, she was delivered to Antwerp, Belgium sometime prior to September 16, 1965, when Mr. DeWitt, a Bureau Veritas surveyor, boarded her to commence a routine annual survey. In the course of the annual survey, DeWitt surveyed the outer hull while the vessel was in drydock. Even though he was not required to do so, on September 21, 1965, DeWitt entered the holds of the vessel and examined her to the 'tween decks level "for curiosity's sake." Although he did not enter the lower holds, he did shine his flashlight about in a cursory fashion. Seeing nothing amiss in the course of his examinations, he confirmed the vessel in class on September 22, 1965.

During this period World Tradeways time chartered the vessel to Midland and signed an agreement to that effect on September 16, 1965. On September 17, 1965, World Tradeways, warranting that the vessel was in class, placed insurance with the plaintiff, Steamship Mutual Underwriting Association, Ltd. Midland, making a similar warranty, obtained an indemnity policy from the plaintiffs the "Great American Insurance group" on September 21, 1965. World Tradeways' purchase of the vessel was closed on September 25, 1965.

On September 25, Midland, through its local agent, Agence Maritime Wall & Co., arranged by telephone to have Bureau Veritas conduct an "on hire" survey before chartering. Mr. DeWitt was assigned to conduct this survey because of his familiarity with the TRADEWAYS II as the ship by this time had been renamed. In conducting this survey, DeWitt was acting as agent for the charterer, Midland. He was accompanied by a Mr. Loze of the J. H. Poll Company, acting as representative of the owner, World Tradeways.

The primary purpose of an "on hire" survey before charter is to inform the charterer of the condition of the ship so that it may be assured that the ship may safely make the voyage contemplated. In view of this purpose and the fact that a charterer is not generally familiar with the vessel, "on hire" surveys are more thorough than annual surveys. In any event, during the pendency of this "on hire" survey, Mr. DeWitt discovered a number of serious defects in the lower hold areas of the vessel. Among other discrepancies, Mr. DeWitt found 4 portside shell frames in the #1 hold to be severely wasted; holes existing in the #1 deep tank covers; and the frames of the bulkhead between the #2 and #3 holds bent and distorted. These defects concerned Mr. DeWitt, who discussed them with his superior, Van Soom, the head of the Bureau Veritas Antwerp office, after the second day of the inspection. They jointly decided that, as a result of these and other internal defects, Bureau Veritas could no longer certify the vessel in class. Accordingly, Mr. DeWitt returned to TRADEWAYS II and removed the classification certificate on the following day.

Following the lifting of the certificate, DeWitt and Loze, the owner's representative, apparently had discussions and disagreements as to precisely what repairs would have to be effected in order to restore the TRADEWAYS II to class. At this juncture, Mr. DeWitt asked his supervisor, Mr. Van Soom, to come with them in order to "arbitrate" the differ-

ences in opinion as to which repairs had to be done in order to restore class. On the 28th of September, Van Soom, De-Witt, and Mr. Campus, a Bureau Veritas hull expert, boarded the TRADEWAYS II and investigated the internal areas that had been called into question by De-Witt's initial "on hire" report. On the same day, Van Soom sent a letter to World Tradeways itemizing which repairs had to be accomplished immediately before Bureau Veritas would restore class. The letter is divided into two sections; the first is a list of 7 defects to be repaired before class could be restored. The second section contains a list of defects which Bureau Veritas would allow to be deferred until the next annual survey. Among the deferrable defects were the four portside wasted frames and the tops of the deep tanks in the #1 hold. World Tradeways, concerned by the declassification of its vessel, apparently commenced suit in Belgium to rescind their purchase of TRADEWAYS II. Another surveyor, Mr. Spreutels, was appointed by the Nautical Commission of the Court of Commerce in Antwerp to supervise the aforementioned repairs at the Mercantile Engineering and Graving Docks Co., also in Antwerp. Although some of the repairs that were allowed to be deferred were actually carried out, the frames and deep tank tops in the #1 hold, so far as the evidence appears, were not repaired. Upon receipt of a letter from Mr. Spreutels detailing the repairs that had been effected, Bureau Veritas restored class to the vessel on October 7, 1965.

On October 1, 1965 the Chinese crew and Wang King, the master, arrived in Antwerp to take over the vessel. On taking command, Wang King personally surveyed the ship and found her satisfactory in all respects except that the deck plating on both sides of the #3 hold appeared to him to be weak and wasted. It should be noted that the captain and his officers claim to have inspected and been satisfied with the condition of all of the internal areas of the ship in which repairs were deferred. On October 14, 1965, the ship completed loading approximately 9600 tons of steel coils and plates for shipment to Great Lakes ports.

On October 15, the vessel broke ground on her ill-fated voyage to the Great Lakes. After a 6 hour delay in Antwerp harbor caused by the failure of a steam condensor pipe, the TRADEWAYS II recommenced her voyage. Although the voyage proceeded smoothly from this point, notations in the engine room log indicate that the vessel was almost continuously pumping water from the engine room, boiler room, and tunnel bilges. The log also indicates that the pumps in those areas broke down frequently and required constant repair by the crew. On October 21, the ship encountered a storm which, according to the captain's evidence, while not exceptional in force, did cause the ship to labor. At 1500 hours, October 21, the engine room log indicates that water was being pumped out of the deep tanks in #1 hold. At 1600 hours, the master noticed that the ship was down by the bow and either went to investigate himself or sent his first officer. Deep water was discovered in the #1 hold below the 'tween decks level, and at 1635 hours the master ordered the engineer to commence pumping the #1 hold.

The situation onboard TRADEWAYS II rapidly worsened. At 1700 hours, according to the captain, he discovered water in the #2 and #3 holds and ordered immediate pumping of the same. He ordered the engines slowed shortly thereafter, and the engine room log reflects that this was done at 1750 hours. The order to stop engines was given at 1840 hours, and an S.O.S., according to Wang King, was sent 20 minutes before. During the course of the night, several ships responded to the TRADEWAYS' call. At about 2200 hours, some of the crew, with or without orders, launched the life boats, which the captain tells us sank in the proximity of TRADEWAYS and one of the rescuing vessels, the LONDONER. According to Wang King, some of the crew swam back to the TRADEWAYS, and some attempted to reach the LONDONER. A little later,

apparently at or about 2300 hours, the LONDONER approached again, and according to the captain, some crew members jumped overboard and attempted to swim over to her without any orders on his part. It is not known whether these men were rescued or not. In any event, the captain and what remained of the crew spent the rest of the night constructing rafts out of dunnage. At about 0700 on October 22, the water had risen to about three feet in the engine room and shorted out the generators, leaving the ship without power, although this is not reflected in the engine room log. At 0740 hours, the LONDONER and another ship closed, one of the rafts was launched and a number of the crew were rescued, leaving the captain and 4 crew members onboard. At some time during the course of the morning of the 22nd, various photographs of the TRADEWAYS II were taken. These photographs show the ship, low in the water, slightly down at the bow, but sinking on essentially an even keel. At about 1020 hours, an American Naval P-3 aircraft dropped a liferaft near enough to the TRADE-WAYS to be secured by those onboard. Shortly thereafter, it was boarded by the remaining crew members. The captain testified that as he was convinced at this stage that nothing could be done to save the ship, he was the last to enter the raft and be saved. Shortly thereafter, at an undetermined hour, the vessel sank with a total loss of the cargo, and as a subsequent count revealed, the lives of 11 crew members.

The surviving crew members were taken by the rescuing ships to various ports of call and eventually found their way back to Taiwan. The captain and certain officers were carried by "a French vessel", apparently the JEAN L.D., to Avonmouth, England. While en-route, the captain wrote out a report describing the sinking of the TRADE-WAYS II. This report was translated by King's agent at Avonmouth and forwarded to the plaintiff insurance companies.

During the course of their subsequent investigations, plaintiff insurance companies attempted to obtain information about the sinking of the TRADEWAYS II from the masters of the LONDONER and the JEAN L.D. Curiously, the manager of the Steamship Mutual Underwriting Association testified that the owners of the vessels that stood by the TRADEWAYS II in her final agonies and rescued her crew were reluctant to become further involved and instructed their masters to give no statements concerning that event.

I

## THE ISSUE OF CAUSATION OF THE SINKING OF THE TRADEWAYS II

Plaintiffs, the owner of the ill-fated vessel and various insurance companies which, having made payment on policies in favor of the owner and/or charterer, sue as subrogees, assert simple and initially appealing theories of recovery. As summarized in the opening paragraphs of this opinion, they submit that Bureau Veritas undertook to make inspections or surveys pertaining to the seaworthiness of TRADEWAYS and that Bureau Veritas performed such services negligently and in breach of its warranties of workmanlike service. These warranties, of course, are said to enure to the benefit not only of the owner but of the subrogees in proportion to their payments on behalf of the owner and/or the time charterer.[2]

Passing initially the question of whether or not there were any warranties or duties owed by Bureau Veritas

2. Nimpex International, Inc. was the sub-voyage charterer of Midland and "notify party" under the bill of lading covering the cargo aboard TRADEWAYS II. As such, Nimpex asserted total cargo claims of in excess of $1,200,000, which claims were settled for $220,000. The insurance company plaintiffs contributed to this settlement; hence their claims here as subrogees. In their briefs, counsel have argued at length whether or not the insurance companies as such are proper parties plaintiff; but in my view of the case, it is unnecessary to resolve this question.

to persons or firms in the position of plaintiffs in this case, it is necessary, as plaintiffs have recognized, for them to carry the burden, by a preponderance of the evidence,[3] of establishing that failures of Bureau Veritas proximately caused the sinking of the TRADEWAYS. Thus, plaintiffs' primary theory of causation advanced at trial was that the vessel sank because of a failure of four wasted frames in the forward area of the ship which permitted seawater to first enter the #1 hold. Further, under this theory, plaintiffs claim that they have shown that the water then passed aft through the transverse bulkhead separating #1 and #2 holds, thereby causing sufficient flooding to bring about the demise of TRADEWAYS.

■ In my view, plaintiffs have failed to establish this direct theory of causation. Almost of necessity, there is no direct evidence that the four wasted frames in the #1 hold failed and allowed initial entry of seawater. In major part, then, plaintiffs' proof of causation relies on the statement and deposition of Captain Wang King, the engine room log, some photographs apparently, but not certainly, taken by crew members of rescuing vessels, and the testimony of their expert witness. This evidence is infected by a variety of infirmities which will be summarized hereinafter.

Mr. Ganley, plaintiffs' expert, did testify that the probabilities were that the initial entry of seawater was caused by the failure of the four wasted frames in the #1 hold. Ganley, however, candidly admitted that he could offer no firm opinion to this effect.

As counsel for plaintiffs apparently recognize, the crucial testimony in support of their theory of causation is that of Captain Wang King, in the form of a deposition before trial and the unsworn written statement which he prepared while enroute to England following his rescue. The gist of the captain's testimony is that in the afternoon of October 21, he noticed that the ship was down by the bow; he either investigated the situation himself or sent his first mate below to do so; it was initially found that the seawater was below the 'tween decks level in the #1 hold; and an hour or so later, he also discovered water in the #2 hold.

Obviously, since he did not appear at trial, Captain Wang King's demeanor cannot be appraised; yet there are several reasons why I discredit his testimony. First, there are the serious discrepancies between his statement and his subsequent deposition before trial. Second, I am constrained to note that Wang King's testimony was never subjected to cross examination of any kind.[4] Why defense counsel failed to appear at his deposition is uncertain, but surely the fact finder would have benefited from cross examination. This is particularly so in view of the circumstance that

---

3. In a typical admiralty case, the plaintiff, frequenty the cargo owner, has the initial burden of establishing a *prima facie* case of cargo loss. In seaworthiness cases, this burden is normally met by plaintiff establishing loss and then proving that the vessel was unseaworthy when she broke ground. Once this showing has been made by plaintiff, the burden shifts to the defendant, traditionally the vessel owner, to establish his freedom from fault. An owner normally attempts to meet this burden by showing that he comes within one of the exculpatory provisions of COGSA, 46 U.S.C. §§ 4(1) and 4(2) (q); see also Gilmore and Black, The Law of Admiralty, § 3–43 (1957).

As I hold that plaintiffs have failed to meet their initial burden of showing that the TRADEWAYS was unseaworthy when she broke ground, the burden remains plaintiffs' throughout this case—a burden which plaintiffs' counsel have assumed both at trial and in their briefs. This result is also dictated by the fact that this litigation does not involve typical admiralty claims against a vessel owner or charterer who is subject to statutory and common law presumptions and duties.

4. Defendant's counsel sought suppression of Wang King's deposition on the ground that, for one reason or another, he was unable to attend. The motion was denied upon the theory that the deposition's weight would be evaluated "as to weight" in light of counsel's absence and resultant inability to cross examine.

plaintiffs produced no other crew members as witnesses, either by deposition or in person, to corroborate the master. I am also troubled by the absence of any testimony whatsoever from any of the rescuing vessels. Although Tolhurst, a manager of plaintiff Steamship Mutual Underwriting Association Limited, stated in his deposition that the owners of the LONDONER and the JEAN L.D. declined to furnish his agents with any information as to the sinking, I note that the Lloyds Intelligence Reports of October 23 and 25, 1965 indicate that at least some of the rescuing vessels reported by radio that the TRADEWAYS broke in two before she went under on October 22, 1965. Insofar as this theory of the sinking is hotly disputed by plaintiffs, I cannot but wonder if some of the owners' reticence to furnish information might not stem from the fact that the information they would have provided would have been unfavorable to plaintiffs.

The unavailability of the ship's deck log, rough or smooth, and the conflicting justifications for its absence only compound the infirmities of the evidence. According to his deposition, the captain threw the deck log overboard because it became wet during the course of his rescue. I find this "explanation" totally unbelievable. Moreover, in his earlier unsworn statement, the captain asserted that the log had been rescued not by him but by his first mate. Further clouding the disappearance of the log is Mr. Tolhurst's statement in his deposition that his company was in possession of the log after the sinking of the vessel.

The engine room log is the only ship's document to surface at trial. By appearance a rough log, its probative value is weakened by what appears to be erasures and writeovers on the page concerned with the events immediately prior to the sinking. The net effect of this is uncertain, but references to bilges and cargo do appear distinctly under the 1500 hours entry relating to the pumping out of the #1 hold deep tanks. I conclude that there is a real possibility, if not probability, that the log may have been altered, either by the captain or some other officer, in order to conform its entries with the captain's version of the events.

The photographs at first blush appear to help plaintiffs' theory in that they indicate that on the morning of October 22, TRADEWAYS was down at her bow. Reflection on these pictures suggests that they may not be as probative as counsel argue. For example, we do not know by whom or exactly when these pictures were taken. More important, the photographs which suggest that the vessel was down at her bow just prior to her going under may only indicate that she was broaching in a wave at the moment, as indicated by water spilling off her exposed rudder.

Heretofore the discussion has centered on the first part of plaintiffs' two step theory of causation. Aware that a Liberty is a "one compartment" ship and would not sink, therefore, unless more than one hold were flooded with seawater, plaintiffs' Mr. Ganley opined that the ultimate cause of the disaster was the failure of the transverse bulkhead between numbers 1 and 2 holds to contain the sea within the confines of #1 hold where the seawater initially entered. In effect, plaintiffs' theory here is really one of *res ipsa loquitur* based upon the heretofore discussed proposition that the sea initially broke into #1 hold. In other words, assuming the latter proposition, it is plaintiffs' argument that the mere fact of sinking is enough to support the inference that the transverse bulkhead in question failed. Inevitably, this brings us back to the testimony of the captain and the engine room log entries, which I have heretofore noted to be singularly unconvincing.

Even were I to assume the veracity of the testimony contained in the captain's deposition and the crucial engine room log entries, plaintiffs' theory that the water passed aft through the transverse bulkhead between the number one and two holds suffers additional weaknesses. Other evidence, unfortunately for plaintiffs' theory, establishes that this bulkhead was the only bulkhead in the

forward area of the ship which all of the numerous surveyors and investigators who inspected the TRADEWAYS agreed was not in immediate need of repair. This fact would tend to support one of the theories of the defense expert to the effect that the entry of water occurred amidship and then passed forward through other bulkheads that had been found to be in far worse condition.

In sum, I find that plaintiffs have failed in their burden of proving causation by a preponderance of the evidence, the *sine qua non* of recovery against Bureau Veritas in this case. In so ruling, I recognize the evidence does not support a firm, unequivocal, conclusion that TRADEWAYS did not sink as a result of the failure of the frames and deep tank tops in hold #1 and the transverse bulkhead between #1 and #2 holds. The point is that I am unable to say that these defects were in fact the cause of the sinking. Although perhaps unnecessary in this view of the matter, I should add that the testimony of Mr. Tiedemann, the defense expert, regarding the frequency of failures of ancient Liberty ships in the mid-ships area just forward of the deck house is somewhat persuasive. This evidence is supported by the Lloyd's Intelligence Reports of October 23 and 25, 1965 which indicate receipt of radio messages from vessels on the scene that TRADEWAYS broke in two before she sank on October 22.

Finally, there is evidence in the record that the cargo, particularly the steel coils, might have broken loose in the mid-ships area in the at least moderately heavy weather encountered by TRADEWAYS due to rather hurried and faulty stowage of the cargo when she loaded in Antwerp. Admittedly, the record is far from complete on this subject; the point is that this evidence further weakens the plaintiffs' case.

## II

## PLAINTIFFS' RELIANCE UPON THE PRESUMPTION OF UNSEA-WORTHINESS

■ Plaintiffs secondarily seek to use the presumption of unseaworthiness to prove what they cannot show by direct evidence. Generally, where a vessel is lost under ordinary conditions with no other explanation,[5] the law presumes that she was unseaworthy. Federazione Italiana Dei Corsorzi Agrari v. Mandask Compania De Vapores, S. A. (hereinafter, The Perama), 388 F.2d 434, 436 (2d Cir.) cert. denied 393 U.S. 828, 89 S.Ct. 92, 21 L.Ed.2d 99 (1968); South, Inc. v. Moran Towing & Transportation Co., 360 F.2d 1002, 1005 (2d Cir., 1966). Although the presumption normally operates against an owner or demise charterer, it has been held that the presumption may be extended to apply to others who are responsible for the condition of the vessel. In re Marine Sulphur Transport Corp. (hereinafter, "Marine Sulphur"), 312 F.Supp. 1081, 1098 (S.D. N.Y., 1970).

■ In order to bring this presumption to bear against defendant classification society, plaintiffs must establish a number of difficult facts. First, the presumption cannot apply until it is shown that the ship was unseaworthy when it departed Antwerp. Gilmore and Black, The Law of Admiralty, § 3–27, (1957). Plaintiffs must then show that a classification society bears the responsibility for the seaworthy condition of a vessel that it surveys, c. f. *Marine Sulphur, supra.*

■ For the proposition that TRADE-WAYS departed Antwerp in an unseaworthy state, Mr. Ganley testified that the wastage of the frames and the holes in the top of the deep tanks in the #1 hold constituted an unseaworthy condi-

---

5. Whether or not the weather encountered by TRADEWAYS from October 15 through 21 was indeed "ordinary" was debated at trial. The issue is still factually unclear, in part because of the absence of the deck log. Nevertheless, it is assumed for the purpose of decision that the vessel encountered no exceptional weather conditions.

tion before the vessel set sail. This contention was contradicted by defendants' expert, Mr. Tiedemann, who testified that the forward frames receive little stress and that deep tanks, which are often used for holding dry cargo, are not required to be watertight. His testimony that the deferral of repairs to the vessel did not render her unseaworthy is supported by the fact that every surveyor who inspected the vessel in the relevant period concurred in the deferral and thought that she was safe to sail. Three of these surveyors were not employees or agents of Bureau Veritas. Mr. Spreutels, who was appointed by a Belgian court, approved of the schedule of repairs; Mr. Morgan, several months earlier, had thought that the ship was seaworthy even without the repairs ultimately effected in Antwerp on October 7, 1965. Mr. Loze, World Tradeways' agent during the "on hire" survey, not only concurred in the decision to defer repairs to the frames and deep tanks, but also was instrumental in insuring that the deferral occurred. Accordingly, I can only concur with the bulk of the experts and find that TRADEWAYS was seaworthy when she broke ground at Antwerp.

■ Assuming *arguendo* to the contrary, I reason that the presumption would still not be applicable to Bureau Veritas. Historically, the presumption has operated against those who are responsible for and in control of unfortunate vessels, i. e. the owners or demise charterers. The presumption was recently extended in *Marine Sulphur, supra.*, to include a designer-convertor who negligently rebuilt a ship in an inherently unseaworthy manner. In determining liability of the designer-convertor by way of the presumption, the court found that the defendant had, in effect, constructed a new ship, *Marine Sulphur, supra.*, at 1101, and employed the presumption on the basis of product liability, 312 F.Supp. at 1101, 1102. Since it obviously did not design or build or repair the vessel, Bureau Veritas cannot be found responsible for the seaworthiness of the TRADE-

WAYS II under an implied warranty of fitness and suitability for use.

Plaintiffs maintain that Bureau Veritas had control over the condition of the vessel in that the owner and charterer could not have sailed under their insurance policies without the classification certificate. While this might constitute control in some practical or economic sense, it is not sufficient to bring into play the presumption, for the owner and charterer could have either sailed without insurance or paid a higher premium. Accordingly, I find that the presumption of unseaworthiness cannot be used against a classification society which did nothing more than to classify a ship that proved to be unseaworthy.

### III

### THE FUNCTIONS OF A CLASSIFICATION SOCIETY; ITS DUTIES AND WARRANTIES

■ Even upon findings that TRADEWAYS II was unseaworthy upon departing Antwerp, that the unseaworthy conditions or one of them caused the sinking and that defendant knew or should have known of these conditions, plaintiffs would still face great difficulties in recovering against Bureau Veritas. In order to decide whether the owner may recover or the insurance companies may be indemnified, the first step is to determine whether any duties or warranties have been breached. This question cannot, however, be reached until it is understood what warranties were given to or implied in favor of plaintiffs and what duties were owed by Bureau Veritas upon undertaking to survey and classify the TRADEWAYS II. In order to make this determination, it is first necessary to understand the functions of a ship's classification society.

As the evidence here illustrates, a classification society may be called upon to provide a number of different functions and services. In the course of both of the surveys performed by the defendant on the TRADEWAYS II in September, 1965, Bureau Veritas exercised its

function as a classifier of ships. In agreeing to classify TRADEWAYS, Bureau Veritas undertook, no more than to make a statement that the condition of the ship either was or was not in conformity with certain published standards established by the society. To determine whether the condition of a ship will allow the society to enter it on its rolls, the rules of Bureau Veritas require that the ship be subjected to a "special" survey initially and every four years thereafter. In order to maintain class during this four year period, the society requires that the vessel be submitted to a less rigorous "annual" survey during each of the intervening years.

In addition to classifying ships and conducting surveys for that purpose, Bureau Veritas conducts other surveys on demand. An example, of course, is the "on hire" survey performed on TRADEWAYS at the request of the charterer, Midland. As Bureau Veritas explained in its survey report before chartering, its purpose in undertaking to perform this survey was ". . . to survey and notice, describe and report on the general state of condition . . ." of the TRADEWAYS. In asking for this service, Midland was seeking advices as to the seaworthiness of the vessel as well as information pertaining to her ability to perform the charter it had contracted for.

Plaintiffs have enumerated several events or non-events in September, 1965, alleged to constitute negligence or breaches of warranties on the part of defendant.[6] Plaintiffs first complain that the annual survey conducted on the TRADEWAYS II between September 16 and 21, 1965 was inadequate in that DeWitt, the Bureau Veritas surveyor, did not inspect the internal hull of the ship below the

'tween decks and that the survey was performed in contravention of the rules of the society. In support, plaintiffs submit that the inadequacy of the confirmation of class is evidenced by the discovery of numerous defects during the course of the subsequent "on hire" survey and that as a result of the tardy detection of these defects, the defendant was forced to remove its certification of class less than a week after its original confirmation.

Recognizing the surface appeal of these attacks upon the annual survey, I nonetheless find that it was conducted in strict conformity with the rules of the defendant. While it is true, as plaintiffs contend, that Bureau Veritas Rule 2-21-1 provides that a surveyor will inspect a ship's hull, both internally and externally, during the course of an annual survey, paragraph two of the same rule states that the surveyor may consult ship's documents in lieu of a physical inspection of internal areas. In the absence of any proof that DeWitt failed to consult pertinent ship's records, I can only assume that he did in fact do so and that the survey was thus proper within defendant's published rules. Since plaintiffs have made no attempt to show that the defects which were later uncovered could have been discovered by an external inspection, I also conclude that the subsequent confirmation of class was the proper result of this survey. Accordingly, the claims of negligence and unworkmanlike service with regard to the annual survey are untenable.

Plaintiffs next argue that the "on hire" survey of September 25 and 26, 1965 was also conducted in an unworkmanlike or negligent manner. Specific fault is found with the fact that in its technical note to the owner of September

---

6. Defendant continues to claim that this action should be barred by virtue of its standard contractual disclaimer of liability. The disclaimer, which appears in defendant's survey reports under the heading "general conditions", reads as follows:
"The Bureau Veritas declines any responsibility for errors of judgment, mis-

takes or negligence which may be committed by its technical or administrative staff or by its agents."
I adhere to the view expressed in my pretrial memorandum of June 17, 1969 that this disclaimer is overbroad and unenforceable as contrary to public policy.

27, 1965, Bureau Veritas failed to list as defects "affecting classification" certain discrepancies that Morgan earlier had noted and recommended be repaired without delay. Aside from observing that this may simply represent a difference of opinion between two experts and that defendant's survey was more extensive in terms of time expended and in experts consulted, I must emphasize that the Morgan report was in the exclusive possession of the owner, World Tradeways, from the time that it was rendered until the vessel sank. If the owner had truly been concerned with the condition of its ship, it could have brought these discrepancies to the attention of the defendant or Midland or both—but there is no evidence that it did so.

Plaintiffs' final and most serious allegation of negligence or breach of warranty concerns the restoration of class to TRADEWAYS on October 7, 1965. In its September 27 technical note to the owner, Bureau Veritas stated that it was removing the certificates of class from the vessel due to certain enumerated defects "affecting class". In a letter sent the following day, September 28, defendant indicated that it would restore class to the vessel, provided that certain of these defects were repaired immediately and that other defects, also "affecting class", were repaired "before the next annual survey." Plaintiffs contend that this reclassification was false because it certified a ship which the defendant knew contained unrepaired defects serious enough to "affect class". It is plaintiffs' further contention that this restoration of class deceived the owner and charterer as well as their insurers in regard to the true condition of TRADEWAYS and effectively caused them to put to sea an unseaworthy vessel.

■ Even if one were to accept, contrary to my prior findings, that these deferred repairs constituted an unseaworthy condition and were the proximate cause of the sinking, plaintiffs have failed to show either negligence or breach of warranty on defendant's part with regard to the deferral of certain repairs. While this case has engendered much argument as to the meaning of the words "affecting class", there has been no consideration of whether those words apply to each defect individually or to the aggregate. If the latter is the intended meaning, the repair of some of the defects might have sufficed to render the vessel worthy of classification. If the words "affecting class" were intended to refer to each defect individually, there is still no showing that the deferred defects were in fact matters affecting class according to the rules and standards published by Bureau Veritas. Finally, regardless of whether the defendant acted in violation of its own rules or not, the fact remains that the owner and charterer were fully informed of the defects. With knowledge and the opportunity to remedy the defects, World Tradeways and Midland elected to do nothing; "[they] took a calculated risk, and lost." Skibs A/S Gylfe v. Hyman-Michaels Co. (hereinafter "the Gyda"), 304 F.Supp. 1204, 1220 (E.D.Mich., 1969) aff'd 438 F.2d 803 (6th Cir., 1971).

## IV

## OTHER THEORIES OF POTENTIAL LIABILITY OF A CLASSIFICATION SOCIETY

Having held that plaintiffs have failed to prove causation and their specific allegations of negligence and breach of warranty, I nonetheless note that their case raises other questions not briefed by counsel but at least theoretically relevant to the ultimate issue of tort or contractual liability of a classification society.

■ Viewing the matter under theories of tort law, the obvious question is, what duties are owed by a classification society to its clientele? Although there is scant law on the subject, it can be reasoned that by undertaking to survey and classify a vessel, a classification society obligates itself to perform two duties with due care. The first duty, as already discussed, is to survey and classify vessels in accordance with rules and

standards established and promulgated by the society for that purpose. The second duty of a classification society is that of due care in detection of defects in the ships it surveys and the corollary of notification thereof to the owner and charterer.

■■ Although unable to uncover case authorities on the subject, I note a potentially insuperable bar to any recovery at law for a breach of the first duty, to survey and classify in accordance with its own rules and standards. This potential bar stems from the long-standing policy or rule that the owner of a ship has a non-delegable duty to maintain a seaworthy vessel. In recognition of the non-delegable duty of a ship owner or operator to maintain a seaworthy vessel, the Court of Appeals for this circuit has held that an owner cannot make a favorable survey or classification the basis of a due diligence defense. *The Perama, supra.* More specifically, it has been held that this defense will not lie in cases even where a classification society has certified a vessel in contravention of its own rules. *Marine Sulphur, supra.,* 312 F.Supp. at 1101.

The unstated policy underlying the decisions not to allow surveys and classifications to operate as defenses to the duty of providing a seaworthy ship is clearly to preserve the ancient, absolute responsibility of an owner for the condition of his ship. This is evidenced by the fact that, were such surveys and classifications allowed to constitute a due diligence defense, the accountability of owners for the seaworthiness of their vessel for all practical purposes would evaporate. This, in turn, would have the effect of leaving injured seamen and shippers with no effective remedy in most cases.

In theory, recognition of a right of action against a classification society would confer benefit upon ship owners, ship operators and seamen. In practice, such a "new remedy" would produce several undesirable effects. One of these would be to place the ultimate responsibility for seaworthiness on an organization which has contact with the vessel for only brief annual periods, whereas the owner, who is always "present" in respect to his vessel, would elude liability in many cases. Second, this right of action would have the effect of making the classification society an absolute insurer of any vessel it surveys and certifies. Not only is this liability not commensurate with the amount of control that a classification society has over a vessel; it is also not in accord with the intent of the parties, the fees charged or the services performed. Further, by making classification societies the effective insurers of nearly all seagoing vessels, insurance companies such as those here involved, might be putting themselves out of business, a result they certainly did not contemplate by bringing this suit.

On the other hand, the duty to use due care to detect and warn of hazards appears to provide a sounder basis for tort liability of a ship classification society. So far as I can determine, this theory of liability would not offend established case law in admiralty; indeed, it is supported by the holding of the only case which has heretofore dealt squarely with the question of a surveyor's liability. In *The Gyda, supra.,* the defendant classification society, The National Cargo Bureau, had expressly undertaken to perform an "on hire" survey, oversee the loading of dangerous cargo and advise the charterer regarding the safe or unsafe character of the stowage. The trial court found that the surveyor had breached this express undertaking in two ways: (1) by removing its surveyor from the scene during most of the loading period, and (2) by failing to advise the charterer that it was unsafe to sail with the cargo already at dangerous temperatures. The district court went on, however, to find that the surveyor's failure to warn the charterer was not the proximate cause of the ultimate fire and damage since the charterer and master of the vessel subsequently became timely aware of the facts and were in a position to remedy the hazard.

Although the facts and circumstances upon which *The Gyda, supra.*, was decided are different from those presented in this case, the ruling that a classification society may be liable for a failure to detect or warn of dangers on board a ship that it is surveying should theoretically apply to the case at hand. *The Gyda* holding was expressed in terms of a breach of an express undertaking; nonetheless, the district court's extensive use of negligence language and tort theories of causation suggests that its decision was based as much on a breach of duty of due care as upon breach of contract. If so, the court's analysis seems sound; surely, a ship's surveyor or classification society should be charged in law with the reasonable duty of detecting all perceptible defects of the vessel encountered during the survey and notifying the owner and/or charterer thereof.

Most of plaintiffs' allegations of negligence in the present case do not involve a failure to detect or warn. The only allegation of this sort is the alleged "failure" of Bureau Veritas to recognize and report the dents and waviness of the transverse bulkhead between the #1 and #2 holds during this "on hire" survey. Assuming that this failure was negligence on the defendant's part, the rationale of *The Gyda* would require a holding for Bureau Veritas. As noted, the ultimate ruling of *The Gyda* court was that where the owner and/or charterer became timely aware of the defect from other sources but nonetheless failed to rectify the situation, they broke the causal chain and took the consequences upon themselves. I have already found that World Tradeways had exclusive possession of the Morgan report and was aware of the condition of the bulkhead before Bureau Veritas; further, I have determined that the owner and Midland received assurances from their own and other experts that the bulkhead could be repaired at a later date. Hence, this theory of tort liability on the part of Bureau Veritas is not factually supported.

Viewing this case under principles of contract law, I have already discussed and rejected the specific arguments of plaintiffs that Bureau Veritas breached its warranty of workmanlike service in performing the relevant surveys. Plaintiffs' counsel, however, chose not to specifically rely upon a theory or theories supported by the landmark case of Ryan Stevedoring Co. v. Pan-Atlantic Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). These theories, in my view, warrant some discussion.

*Ryan* arose out of an injury sustained on board ship by a longshoreman engaged in off loading cargo which had been improperly stowed by Ryan Stevedoring Company. He sued the shipowner and recovered a substantial judgment. The shipowner in turn sued the stevedore for indemnity on the ground that the latter, through its unsafe stowage of cargo, had caused the unseaworthy condition which rendered the shipowner liable. The jury found that the stevedore did in fact create that condition and awarded indemnification to the shipowner. The defendant appealed this adverse judgment on the grounds that this suit for indemnification was barred by two longstanding principles of admiralty law: .(1) in non-collision cases, the courts will not allow contribution among joint tort feasors, Halcyon Lines v. Haenn Ship Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L. Ed. 318 (1952); and (2) the shipowner's failure to supervise the loading or to reject or correct the unsafe stowage would have been either a superseding or intervening cause eradicating defendant's liability. cf. *The Gyda, supra.*, 304 F.Supp. at 1219.

The Supreme Court, nevertheless, found the contractor liable under its stevedoring contract. It held that where a contractor undertakes to provide a service, implicit in the contract is a warranty that the service will be provided in a workmanlike manner. This warranty is to apply to each of the "inescapable elements of the service undertaken," such as insuring that cargo be stored in a safe manner. The Court also ruled that the failure of the shipowner to discover or correct the unseaworthy condition cre-

ated by the contractor's breach would not lie as a defense in a contractual suit for indemnity. *Ryan, supra,* 350 U.S. at 134, 135, 76 S.Ct. 232. The Court added that it was not breaking entirely new ground in making these holdings, but was merely extending to maritime law the principles of manufacturer's liability first enunciated in MacPherson v. Buick Motor Co., 217 N.Y. 383, 111 N.E. 1050 (1916); *Ibid.,* 350 U.S. 133, 134, 76 S. Ct. 232.

In cases following *Ryan,* there has been considerable confusion concerning the relevance or attempted application of tort standards to indemnification or contract claims. See *The Gyda, supra.,* 438 F.2d at 805, n. 1. Doubtless, the reason for this confusion is that in both negligence and indemnification cases, "recovery may turn upon the standard of the performance of . . . [the] service." *Ryan, supra,* 350 U.S. at 134, 76 S.Ct. at 237. Certain cases have established that the standard of performance required by *Ryan* is not grounded upon tort principles and that even non-negligent performance may confer liability for breach of warranty. Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., Inc. (hereinafter "Italia"), 376 U.S. 315, 319, 84 S.Ct. 748, 11 L.Ed. 2d 732 (1964).

The *Ryan* doctrine is generally limited to maritime contracts, "an area where rather special rules governing the obligations and liability of shipowners prevail, rules that are designed to minimize the hazards encountered by seamen, to compensate seamen for the accidents that inevitably occur, and to minimize the likelihood of such accidents." *Italia, supra.* at 324, 84 S.Ct. at 754. Nonetheless, the *Ryan* warranty has been expanded within the maritime field to cover the activities of ship cleaners, painters, repair yards, launch operators, pilots and towing companies. In addition, *Ryan* has been extended to apply to faults or defects not created by the service contractor. As the Court of Appeals for this circuit has held, if a vessel is in an unseaworthy condition which "workmanlike service" would detect and

correct, the contractor is liable for a failure to eliminate the hazard to the vessel. DeGioia v. United States Lines Co., 304 F.2d 421 (1962).

Thus, it is not difficult to make at least a colorable argument for the applicability of *Ryan* to classification societies in general and to Bureau Veritas in particular. In general, by agreeing to survey and classify the TRADEWAYS II, Bureau Veritas contractually undertook to provide services to World Tradeways and Midland. An "inescapable element" of this contract was the implied warranty of Bureau Veritas to perform the surveys in a safe and competent manner so as not to expose World Tradeways and Midland to risk of loss or liability to others.

Further, in light of the applicability of the "foreseeability test" to "causation" in *Ryan* cases, *The Gyda, supra.,* 438 F.2d at 805 n. 1, 808, plaintiffs here might submit that it was foreseeable that failures by Bureau Veritas in the course of its surveys to detect unseaworthy conditions would expose the owner and charterer to risk. Moreover, it could be suggested that Bureau Veritas knew or should have known that the insurers would be deceived by an improperly granted certification of class. To pursue this reasoning still further, *Ryan* might permit plaintiffs to avoid certain pertinent defenses heretofore discussed. Under *Ryan,* the fact that World Tradeways and Midland had full knowledge of the unseaworthiness of the TRADEWAYS II allegedly detected but not corrected by defendant would not operate as a defense since "[plaintiffs'] failure to discover and correct [defendant's] own breach of contract cannot here excuse that breach." *Ibid.,* 350 U.S. at 135, 76 S.Ct. at 238. Indeed, the circumstance that the unseaworthy conditions were the responsibility of the owner and that the defendant was in no way responsible for their creation might theoretically fail as a defense as it could be argued that workmanlike surveys and classifications would have eliminated the owner's exposure to the dangers they posed. DeGioia v. U. S. Lines Co., *supra.*

Notwithstanding the foregoing, I conclude that no theories based on the *Ryan* doctrine can help plaintiffs recover here, principally because, as already discussed, the burden of insuring the seaworthiness of a vessel must ultimately rest upon the shipowner or charterer unless there is good reason to shift this burden to another party. Presumably one of the reasons that the Supreme Court decided in *Ryan* to shift the responsibility for the unseaworthy condition to the stevedore was the fact that the owner had little or no direct, immediate control over the stevedore or its services there provided. See Tebbs v. Baker-Whiteley Towing Co., 407 F.2d 1055, 1059 (4th Cir., 1969). Recognizing this rationale, I note that the services and activities of a classification society differ markedly from those provided by a stevedore, carpenter, ship's cleaner, and the like. While an owner may have little or no direct control of the activities of a classification society aboard ship, the society rarely, if ever, would create hazards or defects by its functions and activities. Moreover, unlike a stevedore and other similar service contractors, a classification society is functionally incapable of repairing or rectifying defects or hazards caused by itself or others. Virtually all a society can do is observe and report to the owner whatever its inspections reveal. In light of these distinctions, to rule that a ship owner or operator can evade or pass off his historic primary duty to furnish a seaworthy vessel by strict application of the *Ryan* doctrine to a classification society, in my judgment, would work an unsound and unfair dilution of that legal duty.

Another infirmity in theoretical application of the *Ryan* rationale to this case deserves mention. In *Ryan,* the Supreme Court observed that the implied warranty ". . . is comparable to a manufacturer's warranty of the soundness of its manufactured product." 350 U.S. at 134, 76 S.Ct. at 237. That comparison would seem to require that the service create a "product" which by its very nature ". . . is reasonably certain to place life and limb in peril when negligently made . . ." Mac-Pherson v. Buick Motor Co., *supra.,* 217 N.Y. at 389, 111 N.E. at 1053. In cases applying *Ryan,* therefore, the service has involved either building or placing something on board the ship which, by implication at least, is comparable to a product. Furthermore, the service must be one that, if poorly performed, may foreseeably cause injury. For example, a stevedore in the course of its service creates the "product" of stowed cargo. It is also "foreseeable" that if a stevedore's services are improperly performed, thereby rendering the stowage unsafe, some injury may result. Yet if one assumes *arguendo* that a poorly performed survey may foreseeably cause injury, it does not follow that the activities of the society will create any condition on board a vessel even vaguely resembling a "product". This is so because the heretofore noted fact that a classification society is virtually powerless to perform any acts or create any conditions upon a vessel; it can only recommend that the owner or charterer do so.

Finally, it must be recognized that in *Ryan* and its progeny, the warranty has been applied, because of the limited scope of the services involved, to specific conditions created by those services. If the *Ryan* theory were to apply to surveys and classifications of ships, the broad scope of that type of service would require that the warranty cover any unseaworthy condition which might arise on board the surveyed vessel. As already discussed, this would create the unwanted result of making a classification society the absolute guarantor of any vessel it surveys. For this and the foregoing reasons, I conclude that the *Ryan* rationale cannot apply to the services here performed on TRADEWAYS by Bureau Veritas.

## CONCLUSION

It follows, therefore, that judgment should be entered dismissing plaintiffs' claims on the merits.

It is so ordered.